UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

                              Plaintiff,

                    -against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

                              Defendants.

---

Case No. 18-cv-08413 (JLR)
**ORDER**

JENNIFER L. ROCHON, United States District Judge:

　　　After a jury trial, the jury returned a verdict in favor of Defendants.  The Court Exhibits from

the jury trial are appended to this Order:

- Court Ex. 1:  Draft *Voir Dire* Questions

- Court Ex. 2:  Preliminary Instructions

- Court Ex. 3:  Final *Voir Dire* Questions

- Court Ex. 4:  Draft Jury Instructions

- Court Ex. 5:  Draft Verdict Sheet

- Court Ex. 6:  Final Jury Instructions

- Court Ex. 7:  Final Verdict Sheet

- Court Ex. 8:  Special Verdict Form

- Court Ex. 9:  Deposition Transcript (redacted) of C. Kosmidis testimony

- Court Ex. 10:  Jury Note, dated May 8, 2023

- Court Ex. 11:  Jury Note, dated May 9, 2023

- Court Ex. 12:  Jury Verdict  (with juror names redacted)

Dated: May 16, 2023
　　　New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

Plaintiff,

-against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

Defendants.

---

Case No. 18-cv-08413 (JLR)

JENNIFER L. ROCHON, United States District Judge:

## <u>QUESTIONS FOR JURORS</u>

**Please indicate if your answer to any of the following questions is "yes" by circling the number of that question.  If your answer to a question is "no," you need not do anything.  <u>Do not write your name or make any other marks on the questionnaire</u>.  The only marks you should make are circles around the questions for which the answer is "yes."  If, when asked about a "yes" answer, there is a particularly sensitive issue, please say so and we will speak at the bench.**

### A.  <u>General Questions</u>

1.  This trial is expected to last approximately five days.  Do you have any commitments that would interfere with your serving as a juror at a trial that is expected to end by Friday?

2.  Do you have any personal knowledge of the allegations in this case as I have described them?

3.  Have you read or heard anything about this case through the media, the Internet, or any other source?

4.  Do you have any ideas or prejudices that would make it difficult for you to follow my instructions as to the law?

5.  Do you have any doubt that you will be able to apply the law as I explain it to you, even if you disagree with the law or believe that it should be different?

6.  Do you have any religious or ethical beliefs that would prevent you from passing judgment on another person or finding them liable?

**Court Exhibit 1**

7.   If you are chosen as a juror, do you know of any reason why you could not be fair and impartial?

**B.   <u>Knowledge of People or Places</u>**

8.   The plaintiff in this case is Athina Kosmidis, as executor of the estate of Constantino Kosmidis.  Do you know, or have you had any dealings, directly or indirectly, with Athina or Constantino Kosmidis?

9.   The plaintiff will be represented at trial by attorneys Jeffrey A. Rothman and James Meyerson.  Do you know Mr. Rothman or Mr. Meyerson?  Have you, or has anyone close to you, ever had any dealings with Mr. Rothman Mr. Meyerson or their firms?

10.   The defendants in this case are:

   a.   Port Authority of New York and New Jersey

   b.   Port Authority Police Sergeant Bernard Buckner

   c.   Port Authority Police Officer Steven O'Shea

   d.   Port Authority Police Officer Alexander Velez, Jr.

   e.   Port Authority Police Officer Joseph Riccardi, Jr.

Do you know, or have you had any dealings, directly or indirectly, with either the entity or any of the individuals?  Has anyone close to you ever had any dealings with this entity or any of the individuals?

11.   The defendants will be represented at trial by attorneys Cheryl Alterman and Christopher Valletta of the Port Authority Law Department.  Do you know, or have you had any dealings, directly or indirectly, with Ms. Alterman or Mr. Valletta or the Port Authority Law Department?  Has anyone close to you ever had any dealings with Ms. Alterman or Mr. Valletta or the Port Authority Law Department?

12.   The following individuals and entities may be mentioned during the trial, or may be witnesses in this case:

   f.   Constantino Kosmidis

   g.   Athina Kosmidis

   h.   John Kosmidis

   i.   Port Authority of New York and New Jersey ("Port Authority")

   j.   Port Authority Police Department

   k.   Port Authority Sergeant Bernard Buckner

Court Exhibit 1

  l.  Port Authority Police Officer Steven O'Shea

  m.  Port Authority Police Officer Alexander Velez, Jr.

  n.  Port Authority Police Officer Joseph Riccardi, Jr.

  o.  JFK International Airport

  p.  Delta Airlines

  q.  Konstantinos Atsalis

  r.  Sharon Dugan

  s.  Carmen Dunphy

  t.  Christopher Kaddo

Other than what you have disclosed in response to previous questions, do you know any of these individuals or entities?  Have you, or has anyone close to you, had any dealings, directly or indirectly, with any of these individuals or entities?

## C.  Personal Experiences and Opinions

13. Other than what you have disclosed in response to previous questions, have you, or has anyone close to you, ever worked for an airline, at or for JFK International Airport, or for an airport operator?

14. Have you, or has anyone close to you, ever studied or practiced law, or worked in any capacity in the legal field or court system?

15. Have you, or has anyone close to you, ever worked for a police department or in law enforcement?

16. Have you, has or anyone close to you, had an interaction with the Port Authority or law enforcement generally?

17. Do you have any feelings or views about the Port Authority that would affect your ability to listen to the evidence in this case with an open mind and to follow my instructions on the law?

18. Do you have any feelings or views about law enforcement that would affect your ability to listen to the evidence in this case with an open mind and to follow my instructions on the law?

19. Have you ever served as a member of a grand jury?

20. Have you ever served as a juror in any court?

21. Have you or any member of your family ever been employed by the city, state or federal government?

22. Have you, or anyone close to you, ever been a party to a lawsuit, either civil or criminal?

23. Are you unable to be fair and impartial in assessing the testimony of witnesses regardless of the witness's gender, race, national origin, mental or physical disabilities, or age?

24. Do you have any animus or negative pre-disposition concerning individuals who have hearing impairments?

**D. <u>Difficulties in Understanding or Serving</u>**

25. Do you have any problems with your hearing or vision that would prevent you from giving full attention to all of the evidence at this trial?

26. Are you taking any medication, or do you have any medical condition, that would prevent you from giving full attention to all of the evidence at this trial?

27. Do you have any difficulty in reading or understanding English?

28. Is there anything that I have not asked you about that would make you uncomfortable about sitting on this case, or that makes you feel like you cannot be a fair and impartial juror in this case?

**Court Exhibit 1**

<u>Questions for Individual Jurors</u>

1. Please state your name, your county of residence, your borough if you live in one, and your neighborhood.  Have you lived in this county for more than 5 years?

2. How old are you?

3. Do you rent or own your home?

4. How far did you go in school and what schools did you attend, beginning with high school? (If college, what was your field of study in college?)

5. Are you employed? If so, who is your employer and what are your general job duties? (If retired or unemployed, please identify your last employer and general job duties.)

6. How long have you been employed in your current position?  If fewer than five (5) years, where else did you work in the last five (5) years?

7. Who are the members of your household and for whom do they work?

8. If you have grown children, for whom do they work?  If any are college students, what is their field of study?

9. Do you belong to any social, union, professional, political, or religious organizations or clubs? If so, which ones?

10. Where do you typically get your news (for example, print, television, cable news, radio, websites, social media)? Which papers, shows, or sites in particular?

FINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

                  Plaintiff,

       -against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

                 Defendants.

Case No. 18-cv-08413 (JLR)

---

JENNIFER L. ROCHON, United States District Judge:

## PRELIMINARY JURY INSTRUCTIONS

**1.  Role of Judge and Jury**

    **A.**  Now that you have been sworn, let me give you some instructions about your duties as jurors.  In the American system of justice, the judge and the jury have separate roles.

        **i.**  My job is to instruct you as to the law that will govern this case, and I will give you most of those instructions at the end of the trial, although I will give you some, including these, before the end.  You must take your instructions from the Court — that is, from me —and you are bound by those instructions.  You may not substitute your own ideas of what the law is or what you think the law should be.

        **ii.**  Your job as jurors will be to determine the facts based on the evidence that comes in during the course of the trial.  You are the only deciders of the fact issues, and your determination of the facts will control.

        **iii.**  Please do not take anything that I say or do during the course of the trial as indicating that I have a view as to your factual determination.  Those decisions are for you.

        **iv.**  At the conclusion of the case, your job will be to provide a verdict on the claims according to my instructions on the law.

1

FINAL

## 2. Order of Trial

**A.** Let me explain how the trial will proceed.

**B.** The original plaintiff in this case was Constantino Kosmidis. He died during the course of this litigation, for reasons unrelated to the lawsuit and his wife, Athina Kosmidis, has stepped in as plaintiff, as executor of his estate. Mr. Kosmidis is now referred to as plaintiff's decedent.

**C.** The individual defendants in this case are Port Authority Police Sergeant Bernard Buckner, Port Authority Police Officer Steven O'Shea, Port Authority Police Officer Alexander Velez, Jr., and Port Authority Police Officer Joseph Riccardi, Jr. These individual defendants are employed by the Port Authority of New York and New Jersey, the final defendant.

**D.** After I have concluded my preliminary instructions, the next step in the trial will be opening statements. First, counsel for the plaintiff will make an opening statement, which is simply an outline to help you understand the evidence as it is presented. Then counsel for the defendants will make an opening statement. I instruct you, however, that opening statements are not evidence.

**E.** After opening statements, the plaintiff will present evidence. That evidence will consist of the testimony of witnesses as well as documents and exhibits. The plaintiff's lawyers will examine the witnesses and then the defendants' lawyers may cross-examine them. Following the plaintiff's case, the defendants may present a case and may call additional witnesses. The plaintiff's lawyers will have the opportunity to cross-examine any witnesses testifying for the defendants.

**F.** For the efficiency of the trial and convenience of the witnesses, witnesses will generally be called just once whether they are called by the plaintiff or defendant and both parties will conduct their examination of that witness at that time. Do not concern yourself with order of the witnesses; you may consider the relevant testimony of all witnesses, regardless of who may have called them.

**G.** After the presentation of evidence is completed, counsel for the parties will deliver their closing arguments to summarize and interpret the evidence. Just as the lawyers' opening statements are not evidence, their closing arguments are not evidence either.

**H.** Following closing arguments, I will instruct you on the law. Then you will retire to deliberate on your verdict, which must be unanimous, and must be based on the evidence presented at trial.

FINAL

I. It is important to remember that this is a civil case.  You may have heard of the "beyond a reasonable doubt" standard in criminal cases.  That requirement does <u>not</u> apply to a civil case and you should put it entirely out of your mind.  In civil cases, the burden is different and it is called proof by a "preponderance of the evidence."  To establish facts by a preponderance of the evidence means to prove that the facts are more likely true than not true.  I will, however, instruct you fully on the burden of proof after all of the evidence has been received.

## 3.   What Is and Isn't Evidence

A. What, then, is evidence?  Evidence consists only of the testimony of witnesses, documents and other things admitted as evidence, or any stipulations agreed to by the attorneys.  Some of you probably have heard the terms "circumstantial evidence" and "direct evidence."  Do not be concerned with these terms.  You are to consider all the evidence given in this trial.

B. Certain things are not evidence and must not be considered by you.  The following is a list of what is not evidence:

    i. <u>First</u>, statements and questions by any of the attorneys are not evidence.  Nor are statements I make or questions I ask of a witness.  And, as I said a moment ago, opening and closing statements by the parties are not evidence.

    ii. <u>Second</u>, objections to questions are not evidence.  Counsel for the parties are permitted to raise an objection when they believe that evidence being offered is improper under the rules of evidence.  You should not be influenced by the objections or by my rulings on them.  If an objection is sustained, ignore the question and any answer that may have been given.  If it is overruled, treat the answer like any other.  If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

    iii. <u>Third</u>, testimony that I have excluded or told you to disregard is not evidence and must not be considered.

    iv. <u>Fourth</u>, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide the case based solely on the evidence presented here in the courtroom.

## 4.   Evaluating the Evidence

**A.** In deciding the facts of the case, you will have to decide the credibility of the witnesses — that is, how truthful and believable they are.  There is no formula to evaluate evidence.

    **i.** For now, suffice it to say that you bring with you into this courtroom all of the experience and background of your lives.  Do not leave your common sense outside the courtroom.  The same types of tests that you use in your everyday dealings are the tests that you should apply in deciding how much weight, if any, to give to the evidence in this case.  You can apply the same tests here in this courtroom that you use in your everyday life when judging whether someone is telling you the truth:

        **a.** Did they appear to be telling the truth?

        **b.** Did they have a motive to tell you the truth or to lie?

        **c.** Did they appear to have a good recollection of the events they're describing?

    **ii.** Any test that you apply normally in making assessments of reliability and credibility, you can use here. Sometimes, of course, it's not what a witness says but how they say it that can be important to that determination.

**B.** The law does not require you to accept all of the evidence admitted at trial.  In determining what evidence you accept, you must make your own evaluation of the testimony from each of the witnesses and the exhibits that are received in evidence.

**C.** It is essential, however, that you keep an open mind until you have heard all of the evidence in the case.  A case can be presented only step by step, witness by witness.

**D.** As you know from experience, you can hear one person give his or her version of an event and think it sounds very impressive or even compelling, and yet, upon hearing another person's version of the same event — or even the same person cross-examined with respect to the event — things may seem very different.  In other words, there may be another side to any witness's story.

**E.** You should use your common sense and good judgment to evaluate each witness's testimony based on all of the circumstances.  Again, I cannot emphasize too strongly that you must keep an open mind until the trial is over.  You should not reach any conclusions until you have all the evidence before you.

**FINAL**

5.   **Rules of Conduct**

    **A.**  Finally, let me caution you about certain rules and principles governing your conduct as jurors in this case.

        **i.**   <u>First</u>, you must not talk to each other about this case or about anyone who has anything to do with it until the end of the case when you go to the jury room to decide on your verdict.  And why do we have that rule? We have that rule because we know it's human nature, if you start discussing something, you start expressing a point of view, and then you start defending the point of view, and then you start agreeing or disagreeing with each other.  We don't want you to do that until all the evidence is before you.  During deliberations, that's the time to discuss the case.  As I have said, keep an open mind until you start your deliberations at the end of the case.

        **ii.**   <u>Second</u>, do not communicate with anyone else about this case or with anyone who has anything to do with it until the trial has ended and you have been discharged as jurors.  Anyone else includes members of your family and your friends.  And no communicating about the case means no communicating on Facebook, Twitter, blogs, whatever.  You may tell your family and friends that you are a juror in a civil case, but please do not tell them anything else about it until you have been discharged by me.  Do not comment on social media about this case or the fact that you are a juror; do not update your status or any website to reflect that you are a juror.

        **iii.**   <u>Third</u>, do not let anyone talk to you about the case or about anyone who has anything to do with it.  If any person should attempt to communicate with you about this case at any time throughout the trial, either in or out of the courthouse, you must immediately report that to my Deputy and to no one else.  When I say report that communication to no one else, I mean that you should not tell anyone, including your fellow jurors.

            **a.**   To minimize the probability of any such improper communication, it is important that you go straight to the jury room when you come in in the morning and that you remain in the courtroom or the jury room for the duration of the trial day.  You should use the bathrooms in the jury room rather than the bathrooms on this or any other floor; as you were probably told already, you may not use the cafeteria.  Given that our morning and afternoon breaks will be short, it is best that you remain in the jury room if you can.

    **iv.** <u>Fourth</u>, do not do any research or any investigation on your own about the case or about anyone who has anything to do with the case.  During the course of the trial, you will receive all the evidence you may properly consider to decide the case.  Because of this, unless and until you are excused as a juror, you should not attempt to gather any information on your own relating to the case.

        **a.** Do not engage in any outside reading on this case.

        **b.** Do not attempt to visit any places mentioned in the case.

        **c.** Do not use the Internet — Google, Facebook, Twitter, or any other social media site — to learn anything about the case or anyone involved in the case, including the lawyers, witnesses, or me.

        **d.** Do not do research of any nature or talk to anyone about the facts of the case or anyone involved in it.

        **e.** The reason for these rules, as I am certain you understand, is that your decision in this case must be made solely on the evidence presented at trial, or lack of evidence.

    **v.** I expect you to inform me immediately, through my Deputy, if you become aware of another juror's violation of these instructions.

    **vi.** This is a public courtroom.  People can come and go.  It may be that you even know someone who enters this courtroom during this trial. If you do, that's fine. Just let my Deputy know so that I can give you a separate instruction.

## 6.  Notetaking

    **A.** Finally, each of you will be given a notebook and pen.  That is because I permit jurors to take notes.  But you do not have to take notes.  Notes are just an aid to your own recollection.  The court reporters in this case record everything that is said in the courtroom and any portion of the testimony can be read back to you during your deliberations.   If you do take notes, be aware that note-taking may distract you from something important that is happening on the witness stand.  Also, if you do take notes, please write your juror number on the first page of the pad so that everyone can keep track of their notebooks and start using the pad after the first page. If you don't write on the cover, we can sometimes reuse unused pages of the notebooks.

**FINAL**

**B.** I want to emphasize that your notes are not to be shared with fellow jurors during deliberations, that the fact that a juror has taken notes will not entitle him or her to any greater voice in the deliberations, and that a transcript will be available to all jurors if there is any difficulty remembering the testimony.  If you do take notes, all notes must be left each day in the jury room.  My Deputy will make sure that they are secure.

## 7.  Final Instruction

**A.** From this point until the time when you retire to deliberate, it is your duty not to discuss this case, and not to remain in the presence of other persons who may be discussing this case.  In that regard, please remember that the parties and counsel in this case have been instructed to have no contact with any of you.  So if you happen to see any of them outside this courtroom, and they do not acknowledge you, say hello, or make small talk, please do not take offense.  As I mentioned earlier, they are not being rude — they are simply following my instructions.

## 8.  Conclusion

**A.** That concludes my preliminary instructions to you.

**B.** Now we will begin with the initial stage of the case, which, as I said to you, is opening statements, and we are going to begin with the plaintiff.  So at this time I am going to ask all of you to give your undivided attention to the lawyers as they make their opening statements.

**Court Exhibit 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

                                        Plaintiff,

                        -against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

                                        Defendants.

Case No. 18-cv-08413 (JLR)

---

JENNIFER L. ROCHON, United States District Judge:

### QUESTIONS FOR JURORS

**Please indicate if your answer to any of the following questions is "yes" by circling the number of that question.  If your answer to a question is "no," you need not do anything.  <u>Do not write your name or make any other marks on the questionnaire</u>.  The only marks you should make are circles around the questions for which the answer is "yes."  If, when asked about a "yes" answer, there is a particularly sensitive issue, please say so and we will speak at the bench.**

**A.  <u>General Questions</u>**

    1.    This trial is expected to last until early next week.  Do you have any commitments that would interfere with your serving as a juror at a trial that is expected to end early next week?

    2.    Do you have any personal knowledge of the allegations in this case as I have described them?

    3.    Have you read or heard anything about this case through the media, the Internet, or any other source?

    4.    Do you have any ideas or prejudices that would make it difficult for you to follow my instructions as to the law?

    5.    Do you have any doubt that you will be able to apply the law as I explain it to you, even if you disagree with the law or believe that it should be different?

    6.    Do you have any religious or ethical beliefs that would prevent you from passing judgment on another person or finding them liable?

7.   If you are chosen as a juror, do you know of any reason why you could not be fair and impartial?

**B.  Knowledge of People or Places**

8.   The plaintiff in this case is Athina Kosmidis, as executor of the estate of Constantino Kosmidis.  Do you know, or have you had any dealings, directly or indirectly, with Athina or Constantino Kosmidis?

9.   The plaintiff will be represented at trial by attorneys Jeffrey A. Rothman and James Meyerson.  Do you know Mr. Rothman or Mr. Meyerson?  Have you, or has anyone close to you, ever had any dealings with Mr. Rothman or Mr. Meyerson or their firms?

10.  The defendants in this case are:

   a.   Port Authority of New York and New Jersey

   b.   Port Authority Police Sergeant Bernard Buckner

   c.   Port Authority Police Officer Steven O'Shea

   d.   Port Authority Police Officer Alexander Velez, Jr.

   e.   Port Authority Police Officer Joseph Riccardi, Jr.

   Do you know, or have you had any dealings, directly or indirectly, with either the entity or any of the individuals?  Has anyone close to you ever had any dealings with this entity or any of the individuals?

11.  The defendants will be represented at trial by attorneys Cheryl Alterman and Christopher Valletta of the Port Authority Law Department.  Do you know, or have you had any dealings, directly or indirectly, with Ms. Alterman or Mr. Valletta or the Port Authority Law Department?  Has anyone close to you ever had any dealings with Ms. Alterman or Mr. Valletta or the Port Authority Law Department?

12.  The following individuals and entities may be mentioned during the trial, or may be witnesses in this case:

   f.   Constantino Kosmidis

   g.   Athina Kosmidis

   h.   John Kosmidis

   i.   Port Authority of New York and New Jersey ("Port Authority")

   j.   Port Authority Police Department

2

k.    Port Authority Sergeant Bernard Buckner

l.    Port Authority Police Officer Steven O'Shea

m.    Port Authority Police Officer Alexander Velez, Jr.

n.    Port Authority Police Officer Joseph Riccardi, Jr.

o.    JFK International Airport

p.    Delta Airlines

q.    Konstantinos Atsalis

r.    Sharon Dugan

s.    Carmen Dunphy

t.    Christopher Kaddo

u.    Port Authority Lieutenant Daniel Rhien

v.    Port Authority Lieutenant Lance Harrison

Other than what you have disclosed in response to previous questions, do you know any of these individuals or entities?  Have you, or has anyone close to you, had any dealings, directly or indirectly, with any of these individuals or entities?

## C.  <u>Personal Experiences and Opinions</u>

13.    Other than what you have disclosed in response to previous questions, have you, or has anyone close to you, ever worked for an airline, at or for JFK International Airport, or for an airport operator?

14.    Have you, or has anyone close to you, ever studied or practiced law, or worked in any capacity in the legal field or court system?

15.    Have you, or has anyone close to you, ever worked for a police department or in law enforcement?

16.    Have you, has or anyone close to you, had an interaction with the Port Authority or law enforcement generally?

17.    Do you have any feelings or views about the Port Authority that would affect your ability to listen to the evidence in this case with an open mind and to follow my instructions on the law?

18. Do you have any feelings or views about law enforcement that would affect your ability to listen to the evidence in this case with an open mind and to follow my instructions on the law?

19. Have you ever served as a member of a grand jury?

20. Have you ever served as a juror in any court?

21. Have you or any member of your family ever been employed by the city, state or federal government?

22. Have you, or anyone close to you, ever been a party to a lawsuit, either civil or criminal?

23. Are you unable to be fair and impartial in assessing the testimony of witnesses regardless of the witness's gender, race, national origin, mental or physical disabilities, or age?

24. Do you have any animus or negative pre-disposition concerning individuals who have hearing impairments?

25. Do you have any views about people who use curse or swear words that would affect your ability to listen to the evidence in this case with an open mind and to follow my instructions on the law?

## D. Difficulties in Understanding or Serving

26. Do you have any problems with your hearing or vision that would prevent you from giving full attention to all of the evidence at this trial?

27. Are you taking any medication, or do you have any medical condition, that would prevent you from giving full attention to all of the evidence at this trial?

28. Do you have any difficulty in reading or understanding English?

29. Is there anything that I have not asked you about that would make you uncomfortable about sitting on this case, or that makes you feel like you cannot be a fair and impartial juror in this case?

**Court Exhibit 3**

Questions for Individual Jurors

1. Please state your name, your county of residence, your borough if you live in one, and your neighborhood.  Have you lived in this county for more than 5 years?

2. How old are you?

3. Do you rent or own your home?

4. How far did you go in school and what schools did you attend, beginning with high school? (If college, what was your field of study in college?)

5. Are you employed? If so, who is your employer and what are your general job duties? (If retired or unemployed, please identify your last employer and general job duties.)

6. How long have you been employed in your current position?  If fewer than five (5) years, where else did you work in the last five (5) years?

7. Who are the members of your household and for whom do they work?

8. If you have grown children, for whom do they work?  If any are college students, what is their field of study?

9. Do you belong to any social, union, professional, political, or religious organizations or clubs? If so, which ones?

10. Where do you typically get your news (for example, print, television, cable news, radio, websites, social media)? Which papers, shows, or sites in particular?

**Court Exhibit 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

                              Plaintiff,

          -against-                                              Case No. 18-cv-08413 (JLR)

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

                              Defendants.

JENNIFER L. ROCHON, United States District Judge:

## JURY INSTRUCTIONS

# TABLE OF CONTENTS

I. GENERAL INSTRUCTIONS ....................................................................................... 1

    A. Introductory Remarks ..................................................................................... 1

    B. Role of the Court ............................................................................................. 1

    C. Role of the Jury .............................................................................................. 2

    D. Role of Counsel .............................................................................................. 2

    E. Sympathy or Bias ........................................................................................... 3

    F. Burden of Proof .............................................................................................. 4

    G. What Is and Is Not Evidence ......................................................................... 5

    H. Direct and Circumstantial Evidence .............................................................. 6

    I. Witness Credibility ........................................................................................ 7

    J. Prior Inconsistent Statement .......................................................................... 9

    K. Use of Deposition Testimony ...................................................................... 10

II. SUBSTANTIVE INSTRUCTIONS ......................................................................... 10

    A. Section 1983 .................................................................................................. 11

            1. First Element – Action under Color of State Law ............................. 12

            2. Second Element – Deprivation of a Federal Right .......................... 12

                i. Deprivation of a Federal Right: Excessive Force ................. 14

                ii. Deprivation of a Federal Right: False Arrest ........................ 16

                iii. Deprivation of a Federal Right: First Amendment Retaliation
                                .................................................................. 18

                iv. Deprivation of a Federal Right: Failure to Intervene ............ 18

            3. Third Element -- Proximate Cause .................................................... 19

    B. State Law Claims ........................................................................................... 19

            1. Assault ............................................................................................... 20

            2. Battery ............................................................................................... 20

            3. Justification ....................................................................................... 21

            4. False Arrest ....................................................................................... 22

            5. Respondeat Superior Liability on New York State Law claims ........ 22

    C. Stipulation of Facts ....................................................................................... 22

    D. Permissive Adverse Inference ...................................................................... 23

III. DAMAGES ................................................................................................................ 23

    A. Compensatory Damages ............................................................................... 24

    B. Multiple Defendants and Multiple Claims – Avoidance of Double Recovery ..... 25

  C.  Nominal Damages ................................................................................................ 26

  D.  Punitive Damages .............................................................................................. 26

IV.  DELIBERATIONS OF THE JURY ............................................................................ 28

  A.  Selection and Duties of Foreperson .................................................................. 28

  B.  Right to See Exhibits and Hear Testimony; Communication with the Court ....... 28

  C.  Notes ................................................................................................................. 29

  D.  Duty to Deliberate; Unanimous Verdict ............................................................ 29

  E.  Verdict Form ..................................................................................................... 30

  F.  Return of Verdict .............................................................................................. 31

V.  CONCLUSION ......................................................................................................... 31

# I.     GENERAL INSTRUCTIONS

## A.     Introductory Remarks

Members of the jury, I will now instruct you as to the law that governs this case.  You have been handed a copy of the instructions I will read.  You should feel free to read along or to just listen to me.  You will be able to take your copy of these instructions into the jury room.

Listening to these instructions may not be easy because they are long and extensive.  It is important, however, that you listen carefully and concentrate.  I ask you for patient cooperation and attention.  You'll notice that I'm reading these instructions from a prepared text.  It would be more lively, no doubt, if I just improvised.  But it's important that I not do that.  The law is made up of words, and those words are very carefully chosen.  So, when I tell you the law, it's critical that I use exactly the right words.

You have now heard all of the evidence in the case as well as the final arguments of the parties.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in the case.

There are three parts to these instructions.  First, I'm going to give you some general instructions about your role, and about how you are to decide the facts of the case.  Most of these instructions would apply to just about any trial.  Second, I'll give you some specific instructions about the legal rules applicable to this particular case.  Third, I'll give you some final instructions about procedure and deliberations.

## B.     Role of the Court

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal matters, you must take the law as I give it to you.  If any attorney has stated a legal principle

different from any that I state to you in my instructions, it is my instructions that you must follow. You must not substitute your own notions or opinions of what the law is or what you think it ought to be. You are to consider these instructions together as a whole; in other words, you are not to isolate or give undue weight to any particular instruction.

### C.      Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts. You evaluate the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Do not conclude from any of my rulings on objections or anything else I have done during this trial that I have any view as to the credibility of the witnesses or how you should decide the case. Any opinion I might have regarding the facts is of absolutely no consequence.

It is your sworn duty, and you have taken the oath as jurors, to determine the facts and to render judgment impartially and fairly, solely on the evidence in this case and the applicable law.

### D.      Role of Counsel

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. It is my job to rule on those objections. Therefore, why an objection was made or why I ruled on it the way I did is not your concern. You should draw no inference from the fact that an attorney objects to any evidence. Nor should you draw any inference from the fact that I might have sustained or overruled an objection. If I sustained the objection, you may not consider the testimony or exhibit at issue; if I overruled the objection, you may consider the testimony or exhibit just as you would any other evidence in the case.

The personalities and the conduct of counsel in the courtroom are not in any way at issue. If you formed opinions or had reactions of any kind to the lawyers here, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, those opinions or reactions should not enter into your deliberations.

During the course of the trial, I may have had to correct the presentation of an attorney, for example, to ask them to rephrase a question. You should draw no inference against the attorney or the client. It is the duty of the attorneys to advocate on behalf of their clients.

From time to time, the lawyers and I had conferences out of your hearing. These conferences involved procedural and other legal matters, and should not enter into your deliberations at all.

### E.     Sympathy or Bias

You must evaluate the evidence calmly and objectively, without prejudice or sympathy. You must be completely fair and impartial. Your verdict must be based solely on the evidence presented at this trial, or the lack of evidence.

You may not consider, in deciding the facts of the case, any personal feelings you may have about the race, religion, national origin, gender, age, sexual orientation, disability, or physical appearance of any party or witness. It is equally improper for you to allow any personal feeling that you might have about the nature of the claims or defenses to influence you in any way. The parties in this case are entitled to a trial free from prejudice and bias. Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

The case should be decided by you as an action between parties of equal standing in the community, of equal worth, and holding the same or similar stations in life. The individual

defendants are not to be favored or disfavored because they are members of the Port Authority Police Department, nor is the plaintiff or the plaintiff's decedent to be favored or disfavored because of their status, employment, or background.  Similarly, the Port Authority of New York and New Jersey, which is a governmental entity, is entitled to stand equal before the law.  All parties are entitled to the same fair trial by you.

### F.      Burden of Proof

At various times in these instructions I will use the term "burden of proof" in order to inform you which party has the burden of proof on a particular claim or a particular issue.  As this is a civil case, the standard of proof is a preponderance of the evidence.

The party who has the burden of proof on a particular issue has the burden of establishing their position on that issue by a preponderance of the evidence. If you conclude that the party who has the burden of proof on an issue has failed to establish their position by a preponderance of the evidence, you must decide against that party on that issue.

What does a "preponderance of the evidence" mean?   To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.  In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If you find that the credible evidence on a given issue is evenly divided between the parties – that it is equally probable that one side is right as it is that the other side is right – then you must decide that issue against the party having this burden of proof.  That is because the party bearing

4

this burden must prove more than simple equality of evidence – the party must prove the element at issue by a preponderance of the evidence.  On the other hand, the party with this burden of proof need prove no more than a preponderance of the evidence.  So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof – that what the party claims is more likely true than not true – then that element will have been proved by a preponderance of the evidence.

One final note on the burden of proof: some of you may have heard of "proof beyond a reasonable doubt."  As I told you at the beginning of the trial, "beyond a reasonable doubt" is the standard of proof in a criminal trial.  It does not apply to a civil case such as this and you should put it out of your mind.

### G.    What Is and Is Not Evidence

In determining the facts, you must rely upon your own recollection of the evidence.  The evidence in this case is the sworn testimony of the witnesses and the exhibits received in evidence.

The only exhibits that are evidence in this case are those that were received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness' recollection.  Some exhibits have redactions on them, or places where the text has been blocked out.  You should not concern yourself with what was redacted, nor why anything was redacted from a document.

As I told you at the start of this case, statements and arguments by the lawyers are not evidence, because the lawyers are not witnesses.  What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your

verdict.  If your recollection of the facts differs from the lawyers' statements, however, it is your recollection that controls.

For the same reasons, you are not to consider a lawyer's questions, restatements of exhibits, or summarizing of the witness' testimony as evidence.  It is the witnesses' answers to those questions, evaluated in the context of the question asked, or the exhibits themselves that are evidence.  Similarly, any statements that I may have made do not constitute evidence.  It is for you alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.

Finally, this means, of course, that anything you may have heard or read outside of this courtroom – on the internet, in the news media, or anywhere else – may play no role in your deliberations.  Your decision in this case must be made solely on the evidence presented at trial.

## H.    Direct and Circumstantial Evidence

Generally, there are two types of evidence that you may consider in reaching your verdict. One type of evidence is direct evidence.  Direct evidence is testimony by a witness about something he or she knows by virtue of his or her own senses – something the witness has seen, felt, touched, or heard.  For example, if a witness testified that when he or she left the house this morning, it was raining, that would be direct evidence about the weather.  Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  For example, assume that when you came into the courthouse this morning the sun was shining and it was a nice day.  Assume that the courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone walked in with an umbrella, which was dripping wet.  Then a few minutes later another person entered with a wet raincoat.  Now, you cannot look

outside of the courtroom and you cannot see whether or not it is raining.  So, you have no direct evidence of that fact.  But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason, experience, and common sense from one established fact the existence or non-existence of some other fact.  As you can see, the matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation.   An inference is a logical, factual conclusion which you might reasonably draw from other facts that have been proven.  Many material facts – such as what a person was thinking or intending – are not easily proven by direct evidence.  Proof of such matters may be established by circumstantial evidence.

Circumstantial evidence is as valuable as direct evidence.  The law makes no distinction between direct and circumstantial evidence.

There are times when different inferences may be drawn from the evidence.  The plaintiff asks you to draw one set of inferences.  The defendants ask you to draw another.  It is for you, and for you alone, to decide what inferences you will draw.

## I.       Witness Credibility

You have had the opportunity to observe the witnesses.  It is now your job to decide how believable each witness was in his or her testimony.  You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, the relationship of the witness to the controversy and the parties, the witness' bias or impartiality, the reasonableness of the witness' statement, the strength or weakness of the witness' recollection

viewed in the light of all other testimony, and any other matter in evidence that may help you decide the truth and the importance of each witness' testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given and all of the other evidence in the case. How did the witness appear?  Was the witness candid, frank, and forthright; or, did the witness seem to be evasive or suspect in some way?  How did the way the witness testified on direct examination compare with how the witness testified on cross-examination?  Was the witness consistent or contradictory?  Did the witness appear to know what he or she was talking about?  Did the witness strike you as someone who was trying to report his or her knowledge accurately?  These are examples of the kinds of common-sense questions you should ask yourselves in deciding whether a witness is, or is not, truthful.  Often it is not what a person says but how he or she says it that moves us.

In passing upon the credibility of a witness, you may take into account any inconsistencies or contradictions as to material matters in his or her testimony.  You should also take into account any evidence that the witness who testified may benefit in some way from the outcome in this case.  Likewise, you should note any evidence of hostility or affection that the witness may have towards one of the parties.  Such bias or interest in the outcome creates a motive to testify falsely.  It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony and bear that factor in mind when evaluating the credibility of the testimony.

This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely.  It is for you to decide to what extent, if at all, the witness' interest has affected or colored his or her testimony.

If you find that any witness has willfully testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety.  On the other hand, even if you find that a witness has testified falsely about one matter, you may reject as false that portion of his testimony and accept as true any other portion of the testimony which you find credible or which you may find corroborated by other evidence in this case.  A witness may be inaccurate, contradictory, or even untruthful in some aspects, and yet be truthful and entirely credible in other aspects of his testimony.

You have heard testimony from witnesses who are police officers.  You should not give the testimony of a police officer any more or less weight solely for that reason.  You must evaluate a police officer's testimony in the same way that you would evaluate the testimony of any other witness.

The ultimate question for you to decide in passing upon credibility is: did the witness tell the truth before you?  It is for you to say whether his or her testimony at this trial was truthful in whole or in part.

**J.      Prior Inconsistent Statement**

You have heard evidence that certain witnesses may have made statements on earlier occasions which counsel argue are inconsistent with their trial testimony.  If you find that a witness made an earlier statement that conflicts with that witness' trial testimony, you may consider that fact in deciding how much of the trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so, how much, if any, weight to be given to the inconsistent statement in determining whether to believe all or part of the witness' testimony.

### K.     Use of Deposition Testimony

Some of the testimony before you is in the form of depositions which have been received in evidence.  A deposition is simply a procedure where the attorneys for one side may question a witness or an adversary party under oath before a court stenographer prior to trial.  This is part of the pretrial discovery, and each side is entitled to take depositions.  You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at this trial.

## II.     SUBSTANTIVE INSTRUCTIONS

I will turn now to my instructions on the substantive law to be applied to this case.

This is a civil case with claims brought by the plaintiff against the defendants. Parties who bring claims are called plaintiffs. The original plaintiff in this case was Constantino Kosmidis.  He passed away in December 2021 for reasons unrelated to the lawsuit, and his wife, Athina Kosmidis, has stepped in as plaintiff, as executor of his estate.  Mr. Kosmidis is now referred to as plaintiff's decedent.

After a plaintiff brings claims, the defendants are then called upon to respond to the claims. The individual defendants in this case are Port Authority Police Sergeant Bernard Buckner, Port Authority Police Officer Steven O'Shea, Port Authority Police Officer Alexander Velez, Jr., and Port Authority Police Officer Joseph Riccardi, Jr. (also sometimes referred to as "the individual

defendants"). These individual defendants are employed by the final defendant, the Port Authority of New York and New Jersey (the "Port Authority"), which is a governmental entity.

You should consider plaintiff's claims against each of the defendants separately. Each defendant is entitled to a fair consideration of the evidence relating to that defendant, and is not to be prejudiced by any finding you make for or against any other defendant.

I will now discuss each of the claims in this case and the elements of each of these claims.

## A.    Section 1983

Plaintiff asserts claims under a federal civil rights law, 42 U.S.C. § 1983, or "Section 1983" for short. Section 1983 provides a remedy for individuals who have been deprived of their federal constitutional rights under color of state law. Section 1983 states, in relevant part that:

> Every person who, under color of [state law], subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the [United States] Constitution and [federal] laws, shall be liable to the party injured [for damages].

Section 1983 creates a form of liability in favor of people who have been deprived of rights secured to them by the United States Constitution. Section 1983 itself does not establish or create any federally protected right. Rather, it is the statute that allows people to enforce rights guaranteed to them by the United States Constitution, including their rights under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from unlawful arrest or excessive force. Plaintiff alleges that the defendants deprived Mr. Kosmidis of his constitutional right to be free from false arrest and the use of excessive force under the Fourth and Fourteenth Amendments, and to be free from retaliation based on his First Amendment rights. Defendants deny plaintiff's claims.

To establish claims under Section 1983, plaintiff must demonstrate, by a preponderance of the evidence, the following three elements:

11

First, that the acts complained of were committed by the defendant acting under color of state law;

Second, that this conduct deprived the plaintiff – or, here, plaintiff's decedent - of rights protected by the United States Constitution or laws of the United States; and

 Third, that the defendant's conduct was a proximate cause of the injuries and damages sustained by the plaintiff's decedent.

I will now explain each of these elements in greater detail.

### 1.      First Element – Action under Color of State Law

As to the first element — whether the individual defendants were acting under color of state law — I instruct you that there is no dispute in this case that, during their interactions with Mr. Kosmidis, the individual defendants were acting as on-duty members of the Port Authority Police Department, and that they were therefore acting under color of state law. Plaintiff has therefore established this element, and you do not have to consider it.

### 2.      Second Element – Deprivation of a Federal Right

The second element that plaintiff must prove by a preponderance of the evidence is that the defendant you are considering deprived the plaintiff of a right protected by the United States Constitution.  Here the plaintiff alleges that the defendants deprived Mr. Kosmidis of three federal rights – the right to be free from excessive force under the Fourth Amendment, the right to be free from false arrest under the Fourth Amendment, and the right to be free of retaliation for exercising his First Amendment freedom of speech.

I will detail the elements of each of these alleged Constitutional violations in a few moments, but first, generally speaking, in order for plaintiff to establish this element of a Section

1983 claim, a plaintiff must prove two things by a preponderance of the evidence with respect to each defendant:

First, the plaintiff must prove that the defendant acted in the way that plaintiff alleges. In other words, plaintiff must prove by a preponderance of the evidence that the defendant you are considering took the actions that the plaintiff claims violated Mr. Kosmidis's Constitutional rights.

The law imposes liability only upon a defendant who "subjects, or causes to be subjected" any person to the deprivation of a federal right. Thus, in order for the plaintiff to prevail on his claims, there must be some evidence of personal involvement by the defendant you are considering. Personal involvement may be established by a showing of direct participation, namely personal participation by one who has knowledge of the facts that rendered the conduct illegal, or indirect participation such as ordering or helping others to do the unlawful acts. As you will be instructed further, a defendant may also be liable for failure to intervene if the officer observes a Constitutional violation and has sufficient time and ability to act to prevent it, but does not. Therefore, you must first make a determination of personal involvement by the defendant you are considering in the constitutional violations alleged by the plaintiff. If you find that a defendant was not personally involved in the deprivation of Mr. Kosmidis's constitutional rights, then you must find in favor of the defendant on that alleged violation. If, however, you find that a defendant was personally involved in the deprivation of the Mr. Kosmidis's constitutional rights, then you must go on to determine whether the plaintiff has proven the other elements of the claims regarding the deprivation of Mr. Kosmidis's Constitutional rights against that defendant. Although there are multiple defendants in this case, each defendant is entitled to fair, separate, and individual consideration without regard to your decision as to the other defendants.

The plaintiff must also establish that the defendant you are considering acted intentionally or recklessly, rather than accidentally. An act is intentional if it is done voluntarily and deliberately and not because of mistake or accident. An act is reckless if done in conscious disregard of its known probable consequences. To be clear, Section 1983 does not require the plaintiff to demonstrate that the defendant you are considering acted with the specific intent to violate Mr. Kosmidis's federally protected rights.

Second, the plaintiff must prove that the defendant's conduct caused Mr. Kosmidis to suffer the loss of a Constitutional right.

I will now discuss in more detail the federal rights that plaintiff alleges Mr. Kosmidis was deprived of by each defendant. You have heard both plaintiff's and defendants' versions of what happened in this case, and it is up to you to first decide what actually occurred on September 15, 2017 based on the evidence. With that determination in mind, you should then consider, under the law as I am about to instruct you, whether the plaintiff has established that the defendants violated Mr. Kosmidis's Constitutional rights.

### i.     Deprivation of a Federal Right: Excessive Force

Plaintiff contends that the individual defendants subjected Mr. Kosmidis to the use of excessive force, and that therefore he was deprived of his rights guaranteed by the Fourth Amendment to the United States Constitution. The individual defendants deny these allegations and contend that they did not use excessive force. It is for you to decide whose version of events you believe.

The Constitution protects people from being subjected to unreasonable uses of force by police officers. A use of force can be applied through any physical means, such as, for example, blows inflicted, pushing, or through the use of handcuffs. Under the Fourth Amendment, a police officer may only use such force as is "objectively reasonable" under all of the circumstances.

14

Reasonable force means the amount of force a reasonable and prudent police officer would use under the same facts and circumstances, without considering the intent or motivation of the particular defendant officer who actually used the force. In other words, even if the individual defendants acted with evil intent, the force used will not be considered excessive if it was reasonable under all of the surrounding circumstances. On the other hand, if the individual defendants acted with good intent and in good faith, if the force used was unreasonable given the surrounding circumstances, then it was a Constitutional violation.

In determining whether the defendant you are considering used unreasonable force in this case, you should consider the facts known to the defendant at the time, and other relevant circumstances at the time any force was used, including the severity of the alleged crime at issue and whether Mr. Kosmidis posed an immediate threat to the safety of the defendants or others. Because police officers are often forced to make split second judgments about the amount of force that is necessary in a given situation, you must judge the reasonableness of the force used from the perspective of a reasonable police officer on the scene at the time, rather than with the 20/20 vision of hindsight.

You do not have to determine whether the defendant had less intrusive alternatives available or whether there were less harmful types of force available. The defendant need only to have acted within that range of conduct identified as objectively reasonable. If you find that the amount of force used was greater than a reasonable person would have employed, the plaintiff will have established the claim of loss of a federal right.

In making this determination you must keep in mind that a police officer is not permitted to use any force beyond that reasonably necessary to accomplish a lawful purpose. It is not necessary that the force used by the individual defendants caused serious long-lasting harm to Mr.

Kosmidis to establish liability. If you find that the force used by the individual defendants exceeded the force (if any) reasonably needed under the factual circumstances, then you must find the individual defendants liable for excessive force under the Fourth Amendment. The severity of the injury, if any, is an issue as to damages, not liability.

### ii. <u>Deprivation of a Federal Right: False Arrest</u>

Plaintiff also claims that Mr. Kosmidis's rights were violated because Mr. Kosmidis was falsely arrested by the defendants.  The individual defendants contend that they acted lawfully under the circumstances.

The primary contested issue for this claim is whether Mr. Kosmidis's detention was justified by probable cause.  Because probable cause is an affirmative defense, the defendants bear the burden of proving by a preponderance of the evidence that the arrest was justified by probable cause.  If you find that the defendants lacked probable cause to arrest Mr. Kosmidis, you must find that they deprived Mr. Kosmidis of a federal Constitutional right to be free of false arrest under the Fourth Amendment.

<u>What is probable cause?</u>

Probable cause exists when, at the time of the arrest, the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable prudence to believe that the person to be arrested has committed or is committing a crime or offense. The standard is objective, and the officers' subjective beliefs and motivations are irrelevant to the analysis.  The existence of probable cause must be determined on the basis of the information reasonably available to the arresting officer at the time of the arrest.

In order to determine that probable cause existed, there need only have been probable cause for the defendants to believe that Mr. Kosmidis had committed some crime or offense. Under the New York law, a police officer has the right to arrest a person without a warrant whenever the

officer reasonably believes that such person has committed an offense in the presence of the officer. The individual defendants assert that there was probable cause to arrest Mr. Kosmidis for the offense of disorderly conduct under Section 240.20 of the Penal Law of the State of New York. There are two elements to an offense of disorderly conduct. First, the person must have the intent to cause public inconvenience, annoyance or alarm, or recklessly created a risk thereof. Second, the person must engage in fighting or in violent, tumultuous or threatening behavior; or, in a public place, use abusive or obscene language, or make an obscene gesture. There must be a public dimension of the offensive conduct. It must extend beyond a private exchange between individuals.

In evaluating whether there was probable cause, it is not relevant whether Mr. Kosmidis was in fact guilty of this offense or any offense. The fact that Mr. Kosmidis was not ultimately issued a summons for disorderly conduct does not by itself mean that there was no probable cause at the time of his arrest. In other words, the ultimate disposition of the criminal charges against Mr. Kosmidis is irrelevant to whether there was probable cause at the time of the arrest.

Finally, any conduct that Mr. Kosmidis engaged in after he had already been arrested cannot provide the defendants with probable cause to arrest him.

To recap: If, at the time that the individual defendants arrested Mr. Kosmidis, there was probable cause to believe that he had committed or was committing the offense of disorderly conduct, then the arrest was reasonable and Mr. Kosmidis's rights were not violated. But if the defendants lacked probable cause for the arrest, and all the other elements I have described are satisfied, then they violated Mr. Kosmidis's constitutional rights to be free of unlawful arrest.

17

### iii.  Deprivation of a Federal Right: First Amendment Retaliation

Plaintiff also alleges that the arrest or use of excessive force by the individual defendants were undertaken in retaliation for Mr. Kosmidis having exercised his right to free speech under the First Amendment to the U.S. Constitution.

To prevail on a First Amendment retaliation claim under Section 1983 plaintiff must show that: (1) Mr. Kosmidis had a right protected by the First Amendment; (2) the individual defendants' actions in arresting or using excessive force with respect to Mr. Kosmidis were motivated or substantially caused by Mr. Kosmidis' exercise of that right; and (3) the individual defendants' actions effectively chilled the exercise of Mr. Kosmidis' First Amendment rights.

The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. Speech directed at police officers is protected under the First Amendment unless it is likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

The existence of probable cause defeats a First Amendment claim that a police officer's arrest was based on retaliation for engaging in protected speech.  Therefore, if you find that the individual defendants have proven that they had probable cause to arrest Mr. Kosmidis, you must find that plaintiff has not proven the First Amendment retaliation claim based on false arrest. Likewise, if you find that the individual defendants did not use excessive force, you must find that the plaintiff has not proven the First Amendment retaliation claim based on excessive force.

### iv.  Deprivation of a Federal Right: Failure to Intervene

In addition to alleging that each of the individual defendants themselves used excessive force upon, falsely arrested, and engaged in First Amendment retaliation against Mr. Kosmidis, plaintiff has also alleged that each was aware of the commission of each of these Constitutional violations upon Mr. Kosmidis, and that they failed to intervene to prevent the commission of these

Constitutional violations by their police colleagues.  Police officers and their supervisors are under a duty to intercede and prevent fellow officers from subjecting a citizen to violations of the citizen's Constitutional rights, and may be held liable for their failure to do so if they observe a Constitutional violation and have sufficient time and ability to act to prevent it.

You thus must find the individual defendant you are considering liable on this claim if you find that plaintiff has proven that another defendant violated Mr. Kosmidis's Constitutional rights, and the defendant you are considering had a reasonable opportunity to intervene to prevent any Constitutional violation upon Mr. Kosmidis by their colleagues in the Port Authority Police Department, and that the defendant failed to do so.

### 3.     Third Element -- Proximate Cause

The third element that plaintiff must prove with respect to a Section 1983 claim is that the individual defendants' conduct was a proximate cause of the injuries sustained by Mr. Kosmidis. An act is a proximate cause of compensable injury if it was a substantial factor in bringing about Mr. Kosmidis's injury, and if the injury was a reasonably foreseeable consequence of the individual defendants' conduct.

The question is whether a reasonable person would regard the individual defendants' conduct as being a cause of the injury. If so, the conduct is a proximate cause.

### B.     State Law Claims

In addition to plaintiff's claims that the individual defendants violated Mr. Kosmidis's federal constitutional rights, plaintiff also has claims against the defendants based on New York State law. I will explain the elements of the claims to you, as well as how they apply to the defendants.

1.      **Assault**

Plaintiff brings a state law claim of assault against the individual defendants. An assault is the intentional placing of another person in apprehension of imminent harmful or offensive contact. A defendant is liable for assault when he intentionally causes another person to become concerned that the defendant is about to cause a harmful or offensive bodily contact. In order to commit an assault, the defendant must have the real or apparent ability to bring about that harmful or offensive bodily contact. Ordinarily, threatening words without some action are not enough to constitute an assault. There must be some menacing act or gesture that causes the plaintiff to believe that a harmful or offensive bodily contact is about to occur. It is not necessary that there be any contact.

Notice that I used the word "intentionally" in defining an assault. Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, he is said to have intended that result. Further, although he has no desire to bring about the result, if he does the act knowing, with substantial certainty, that the result will follow, he is also said to have intended that result.

2.      **Battery**

The second state law claim that plaintiff is bringing against the individual defendants is a claim for battery against Mr. Kosmidis.  A person who intentionally touches another person, without that person's consent, and causes an offensive bodily contact commits a battery and is liable for all damages resulting from his act.

Intent involves the state of mind with which an act is done. The intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive. An offensive

bodily contact is one that is done for the purpose of harming another or one that offends a reasonable sense of personal dignity, or one that is otherwise wrongful.

### 3.    Justification

Under state law, law enforcement officers are justified in threatening and using an objectively reasonable degree of force in the performance of their official duties.

This means that justification is a defense to claims of assault and battery. The plaintiff has the burden of disproving justification by a preponderance of the evidence. In other words, the plaintiff must prove, by a preponderance of the evidence, that the defendant you are considering was not justified in threatening or using the alleged force against the plaintiff during the performance of that officer's official duties.

A police officer may use physical force when and to the extent he reasonably believes such to be necessary to effect an arrest, or to prevent an escape from custody, or in self-defense, or to defend a third person from what he reasonably believes to be the use of imminent use of physical force and can be held liable only if the force used was excessive.

In determining whether the force used was excessive or reasonable, you must take into consideration all of the circumstances confronting defendant at the time and place of the incident, including what defendant saw and heard; whether there was assistance available to defendant; what if anything you find that defendant had been informed about plaintiff. In determining reasonableness, you must use an objective standard. Reasonable force means the amount of force a reasonable and prudent police officer would use under the same facts and circumstances, without considering the intent or motivation of the particular defendant officer who actually used the force.

The reasonableness of an officer's force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight.

### 4.      False Arrest

The third of plaintiff's New York state law claims is to recover damages for the false arrest of Mr. Kosmidis.  With exceptions not relevant here, New York and federal law are identical with regard to claims for false arrest. I therefore instruct you that if you find any of the individual defendants liable for false arrest under federal law pursuant to the instructions I gave you, then they are also liable for false arrest under New York state law. Conversely, if you do not find any of the individual defendants liable for false arrest under federal law, they are not liable under New York state law.

### 5.      Respondeat Superior Liability on New York State Law claims

Defendant Port Authority is responsible under New York State Law for the acts of the individual defendants for their on-duty actions during the course of their interactions with Mr. Kosmidis.

Thus, if you find that plaintiff has proven plaintiff's New York State law claims for assault, battery, or false arrest against any of the individual defendants, then you will also have found that plaintiff has proven those claims against defendant Port Authority.

### C.      Stipulation of Facts

A stipulation of facts is an agreement among the parties that a certain fact is true. You must regard such agreed facts as true. Here the parties have stipulated to the following:

> The parties stipulate that there is no existing video or surveillance footage that depicts any of the interactions between Mr. Kosmidis and the individual defendants that you have heard about, or that otherwise depicts Mr. Kosmidis from elsewhere within JFK Airport on September 15, 2017. An attempt was made by the parties to locate any such video footage, including any video footage from cameras controlled by the federal government that were at or near the location of the incident. The parties asked the federal government to produce any video footage related to the incident from video cameras at Kennedy Airport and were informed that no responsive video related to the incident could be located.

> The parties likewise attempted through subpoenas to the federal government to identify any federal employees who may have been involved with, or who may have witnessed, the events you have heard about. The federal government was also unable to identify anyone in response to the parties' subpoenas.

### D.    Permissive Adverse Inference

In this case, evidence has been received which the plaintiff contends shows that Officer O'Shea wrote up a criminal summons at or around the time of the incident between Mr. Kosmidis and the individual defendants and that Sergeant Buckner ripped up the summons.  If you find that plaintiff has proven by a preponderance of the evidence that Sergeant Buckner knew or should have known that litigation was going to result from the incident and that this evidence would be relevant to it, you may infer, though you are not required to do so, that if the summons had been produced in court, it would have been unfavorable to defendants. You may give any such inference, whatever force or effect as you think is appropriate under all the facts and circumstances here.

In making this determination, you may consider whatever facts that you deem to bear upon the issue, including whether Mr. Kosmidis asked for the summons not to be torn up in advance of it being torn up, whether an official process existed for voiding a summons that was not followed, and Sergeant Buckner's state of mind when he tore up the summons.

## III.    DAMAGES

If plaintiff has proven by a preponderance of the evidence that the individual defendants are liable on one or more of plaintiff's claims, then you must determine the damages to which plaintiff is entitled.

There are three types of damages you may consider: compensatory damages, nominal damages, and punitive damages. I will discuss each in turn.

The fact that I am instructing you as to the proper measure of damages does not indicate any view of mine as to which party is entitled to your verdict in this case.  Instructions as to the measure of damages are given for your guidance only in the event that you should find that plaintiff has proven each claim in accordance with my other instructions.

The verdict form I will give you will assist you in recording the determinations, if any, that you make as to damages.

A.      **Compensatory Damages**

The purpose of the law of damages is to award, as far as possible, sufficient damages to compensate a plaintiff for any injury and any loss proximately caused by the defendants' conduct. These are known as "compensatory damages." Compensatory damages seek to make a plaintiff whole—that is, to compensate the plaintiff for the damage suffered.

If you find for plaintiff with respect to any of the claims, then you must award plaintiff the sum that you find by a preponderance of the evidence will fairly and justly compensate plaintiff for any damages you find that were sustained as a direct result or as a reasonably foreseeable consequence of the defendants' conduct.

Compensatory damages are not only for out of pocket expenses that a plaintiff may have borne. A prevailing plaintiff is entitled to compensatory damages for loss of liberty, physical injury, pain and suffering, emotional and mental anguish, and shock and discomfort that the plaintiff suffered because of the defendant's conduct.  Loss of liberty is inherent in unlawful confinement.

The damages that you award must be fair and reasonable, neither inadequate nor excessive.  You should not award compensatory damages for speculative injuries, but only for those injuries that Mr. Kosmidis has actually suffered.  It is plaintiff's burden to prove the amount of Mr. Kosmidis's damages and to prove that the damages were caused by the defendant's actions.  Your determination of damages must not be based on speculation or guesswork.

However, the law does not require a plaintiff to prove the amount of losses with mathematical precision. I cannot give you a yardstick by which to measure the dollar amount of pain or injury. You heard Mr. Kosmidis's testimony and the testimony of the other witnesses, and have seen the documentary evidence concerning damages.  If you award compensatory damages on any particular claim you will have to determine, based on your common sense and experience, that amount of money that will fairly and reasonably make plaintiff whole or compensate plaintiff for the injuries and pain and suffering that Mr. Kosmidis sustained as a consequence of any acts that violated his rights.

You are to use your sound discretion in fixing an award of compensatory damages, drawing all reasonable inferences where you deem appropriate from the facts and circumstances in evidence. In sum, your award of compensatory damages, if any, should reasonably compensate plaintiff for such injury and damage as you find that Mr. Kosmidis has sustained.

### B.      Multiple Defendants and Multiple Claims – Avoidance of Double Recovery

It is important to note that if you find the individual defendants violated more than one of Mr. Kosmidis's rights, plaintiff is entitled to be compensated only for the injuries plaintiff actually suffered.  Thus, if the defendant violated more than one of Mr. Kosmidis's rights, but the resulting injury was no greater than it would have been had the defendants violated one of those rights, you should award an amount of compensatory damages no greater than you would award if defendants had violated only one of Mr. Kosmidis's rights.

However, if defendants violated more than one of Mr. Kosmidis's rights and you can identify separate injuries resulting from the separate violations, you should award an amount of compensatory damages equal to the total of the damages you believe will fairly and just compensate plaintiff for the separate injuries Mr. Kosmidis suffered.

25

In other words, any damage award for a second claim must be limited to the component of injury you find substantiated for this claim, if any, over and above whatever you have already compensated by your awards for other claims.

If you decide that two or more of the defendants are liable for violating plaintiff's rights, then you must simply determine the overall amount of damages that will fairly and justly compensate plaintiff's injury, without breaking that figure down into individual percentages for which each defendant is liable.

Finally, any damages assessed on one or more of the state law claims (assault, battery, or false arrest), will automatically mean that the Port Authority is jointly liable with that individual defendant for whatever damages you award. There is not a separate award of additional damages against the Port Authority; rather the Port Authority and the individual defendants are jointly and severally liable to pay any damages as they relate to the state law claims.

### C.    Nominal Damages

If you return a verdict for the plaintiff, but find that plaintiff has failed to prove by a preponderance of the credible evidence that plaintiff is entitled to any actual compensatory damages, then you must return an award of damages in the sum of one dollar.  This is to show that liability has been proved and that Mr. Kosmidis has been deprived of a Constitutional right, but that plaintiff has not proven that Mr. Kosmidis suffered a serious, actual injury as a result of that Constitutional deprivation.  This type of damages is called "nominal damages."

### D.    Punitive Damages

You may also, in your discretion, make an award of punitive damages. Punitive damages are awarded, in the discretion of the jury, to punish a defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like him from committing such conduct

26

in the future. You may award punitive damages as a separate award in addition to compensatory damages.

You may award the plaintiff punitive damages if you find that the acts or omissions of the defendant were done maliciously or wantonly. An act or failure to act is maliciously done if it is prompted by ill will or spite towards the injured person. An act or failure to act is wanton if done with a reckless or callous disregard for the rights of the injured person. The plaintiff has the burden of proving, by a preponderance of the evidence, that the defendant you are considering acted maliciously or wantonly with regard to Mr. Kosmidis's rights.

If you find by a preponderance of the evidence that the defendant you are considering acted with malicious intent to violate Mr. Kosmidis's federal rights, or if you find that the defendant acted with a callous or reckless disregard of Mr. Kosmidis's rights, then you may award punitive damages. An award of punitive damages, however, is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.

In making this decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether defendant may be adequately punished by an award of actual damages only, or whether the conduct is so extreme and outrageous that actual damages are inadequate to punish the wrongful conduct. You should also consider whether actual damages, standing alone, are likely to deter or prevent this defendant from similar wrongful conduct in the future, if it was in fact wrongful, or whether punitive damages are necessary to provide deterrence. Finally, you should consider whether

punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those defendant may have committed.

If you decide to award punitive damages, these same purposes should be kept in mind as you determine the appropriate sum of money to be awarded as punitive damages. That is, in fixing the sum to be awarded, you should consider the degree to which defendant should be punished for his wrongful conduct, and the degree to which an award of one sum or another will deter defendant or persons like him from committing wrongful acts in the future.

## IV.    DELIBERATIONS OF THE JURY

Ladies and gentlemen of the jury, that concludes the substantive portion of my instructions to you.  You are about to go into the jury room and begin your deliberations.  I will now give you a few final instructions on those deliberations.

### A.    Selection and Duties of Foreperson

It is customary for Juror Number 1 to serve as the foreperson, and that is what we will do here.  The foreperson doesn't have any more power or authority than any other juror, and her vote or opinion doesn't count for any more than any other juror's vote or opinion.  The foreperson is merely your spokesperson to the court.  The foreperson will send out any notes, and when the jury has reached a verdict, the foreperson will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

### B.    Right to See Exhibits and Hear Testimony; Communication with the Court

All of the exhibits admitted into evidence will be sent to the jury room with you.  If you want any of the testimony read, you may request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of the testimony.

28

Your requests for testimony – in fact <u>any</u> communications with the Court – should be made to me in writing, signed, dated, and timed by your foreperson, and given to one of the marshals. Please make any notes as clear and precise as possible.  Do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached and announced in open court by your foreperson.

### C.     Notes

Some of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are solely to assist you as an aid to your memory.  Do not share your notes with other jurors during deliberations.  Notes that any of you may have made may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

### D.     Duty to Deliberate; Unanimous Verdict

Shortly, you will retire to decide the case.  You are not to discuss the case unless and until all jurors are present.  A majority of jurors together are only a gathering of individuals. Only when all jurors are present do you constitute the jury, and only then may you deliberate.

You must base your verdict solely on the evidence and these instructions as to the law, and you are obliged on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with the particular law in question.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement.  Each of you must decide the case for himself or herself, but you should do so only

after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous.  Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors.  Each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors.  No juror should surrender his or her conscientious beliefs solely for the purpose of returning a unanimous verdict.

Remember at all times, you are not partisans.  You are judges—judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.  Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any way or manner any suggestion or hint as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

If you are divided, do *not* report how the vote stands and if you have reached a verdict do not report what it is until you are asked in open court.

### E.   Verdict Form

In a few moments, I will give you the verdict form with the questions for you to answer and you will retire to deliberate on your decision.  The questions are not to be taken as any indication that I have any opinion as to how they should be answered.  I have no such opinion, and even if I did, it would not be binding on you.

You should answer every question except where the verdict form indicates otherwise.  You should also proceed through the questions in the order in which they are listed.  Remember, all answers must be unanimous.

**F.      Return of Verdict**

After you have reached a verdict, your foreperson will fill in the form that has been given to you, you will all sign and date it, and your foreperson will advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you must be in agreement with the verdict which is announced in court.  Once your verdict is announced and officially recorded, it cannot ordinarily be revoked.

## V.      CONCLUSION

In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors, consider all of the evidence, apply your own common sense, and follow my instructions on the law, you will reach a fair verdict here.  Thank you for your time and attention.

31

**Court Exhibit 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

                              Plaintiff,

        -against-                                       Case No. 18-cv-08413 (JLR)

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

                              Defendants.

JENNIFER L. ROCHON, United States District Judge:

# **VERDICT FORM**

**Court Exhibit 5**

**Question 1**:
**Excessive Force**: Has plaintiff proved by a preponderance of the evidence that Mr. Kosmidis was subjected to excessive force under Section 1983 on September 15, 2017, by:

    a.  Sergeant Bernard Buckner:      Yes _____      No _____

    b.  Police Officer Steven O'Shea:    Yes _____      No _____

    c.  Police Officer Alexander Velez, Jr.:  Yes _____      No _____

    d.  Police Officer Joseph Riccardi, Jr.:  Yes _____      No _____

*If you answered YES to either Question 1a, 1b, 1c, or 1d, proceed to Questions 2 and 3.*
*If you answered NO to all parts of Question 1, proceed to Question 4.*

**Question 2**:
(a)    Has plaintiff proved, by a preponderance of the evidence, that he is entitled to compensatory damages for his excessive force claim?

        Yes _____      No _____

(b)    If you answered YES to Question 2a, please write the amount of compensatory damages on the line below that Plaintiff has proven that would fairly and adequately compensate Plaintiff for any injuries proximately caused by his excessive force claim.

        $_____

(c)    If you answered YES to any part of Question 1, but you did not award any compensatory damages to plaintiff on his excessive force claim, please enter a nominal damages award of $1.

        $_____

**Question 3**:
Has plaintiff proved, by a preponderance of the evidence, that he is entitled to punitive damages for his excessive force claim by:

    a.  Sergeant Bernard Buckner:      Yes _____      No _____

                If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

    b.  Police Officer Steven O'Shea:    Yes _____      No _____

                If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

c.   Police Officer Alexander Velez, Jr.:   Yes _____          No _____

                    If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

d.   Police Officer Joseph Riccardi, Jr.:   Yes _____          No _____

                    If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

*(Please proceed to Question 4)*

**Question 4**:

**False Arrest:** Has plaintiff proved by a preponderance of the evidence that Mr. Kosmidis was subject to a false arrest under Section 1983 or New York state law on September 15, 2017 by:

    a.  Sergeant Bernard Buckner:        Yes _____        No _____

    b.  Police Officer Steven O'Shea:     Yes _____        No _____

    c.  Police Officer Alexander Velez, Jr.:  Yes _____        No _____

    d.  Police Officer Joseph Riccardi, Jr.:  Yes _____        No _____

*If you answered YES to either Question 4a, 4b, 4c, or 4d, proceed to Questions 5 and 6.*
*If you answered NO to all parts of Question 4, proceed to page 5.*

**Question 5:**

(a)     Has plaintiff proved, by a preponderance of the evidence, that he is entitled to compensatory damages for his false arrest claim?

        Yes _____        No_____

(b)     If you answered YES to Question 5a, what amount of money should Plaintiff be awarded in compensatory damages that would fairly and adequately compensate Plaintiff for any injuries proximately caused by his false arret that he suffered over and above what you have already compensated him for by your award, if any, on the previously considered claim for excessive force?

        $_____

(c)     If you answered YES to any part of Question 4, but you did not award any compensatory damages to plaintiff on his false arrest claim, please enter a nominal damages award of $1.

        $_____

**Question 6:**

Has plaintiff proved, by a preponderance of the evidence, that he is entitled to punitive damages for his false arrest claim by:

    a.  Sergeant Bernard Buckner:        Yes _____        No _____

            If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

    b.  Police Officer Steven O'Shea:     Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

c.   Police Officer Alexander Velez, Jr.:   Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

d.   Police Officer Joseph Riccardi, Jr.:   Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

*(Please proceed to Question 7)*

4

*If you answered YES to any parts of Questions 1 or 4, please proceed to answer Question 7.*
*If you answered NO to all parts of Questions 1 and 4, please proceed to Question 13.*

**Question 7**:

**First Amendment Retaliation**: Has plaintiff established by a preponderance of the evidence that Mr. Kosmidis was subjected to a false arrest or excessive force in retaliation for exercising his First Amendment right to free speech on September 15, 2017, by:

a.  Sergeant Bernard Buckner:          Yes _____          No _____

b.  Police Officer Steven O'Shea:       Yes _____          No _____

c.  Police Officer Alexander Velez, Jr.: Yes _____          No _____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____          No _____

*If you answered YES to either Question 7a, 7b, 7c, or 7d, proceed to Question 8.*
*If you answered NO to all parts of Question 7, proceed to Question 10.*

**Question 8:**

(a)      Has plaintiff proved, by a preponderance of the evidence, that he is entitled to compensatory damages for his retaliation claim?

        Yes _____          No_____

(b)       If you answered YES to Question 8a, what amount of money should Plaintiff be awarded in compensatory damages that would fairly and adequately compensate Plaintiff for any injuries proximately caused by his first amendment claim for retaliation that he suffered over and above what you have already compensated him for by your award, if any, on the previously considered claims for excessive force and false arrest?

        $_____

(c)      If you answered YES to any part of Question 7, but did not award any compensatory damages to plaintiff on his retaliation claim, please enter a nominal damages award of $1.

        $_____

**Question 9:**

Has plaintiff proved, by a preponderance of the evidence, that he is entitled to punitive damages for his First Amendment retaliation claim by:

a.  Sergeant Bernard Buckner:          Yes _____          No _____

5

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

b.  Police Officer Steven O'Shea:          Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

d.  Police Officer Joseph Riccardi, Jr.:   Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

*(Please proceed to Question 10)*

**Question 10**:
**Failure to Intervene**: Has plaintiff proved by a preponderance of the evidence that a defendant listed below failed to intervene in the use of excessive force or in the false arrest of Mr. Kosmidis by at least one of the <u>other</u> defendants on September 15, 2017?  If you answered YES as to a particular defendant for Question 1 or 4, you may <u>not</u> also answer YES for that defendant for this Question.

    a.   Sergeant Bernard Buckner:       Yes _____       No _____

    b.   Police Officer Steven O'Shea:     Yes _____       No _____

    c.   Police Officer Alexander Velez, Jr.:  Yes _____       No _____

    d.   Police Officer Joseph Riccardi, Jr.:  Yes _____       No _____

*If you answered YES to either Question 10a, 10b, 10c, or 10d, proceed to Question 11.*
*If you answered NO to all parts of Question 10, proceed to Question 13.*

**Question 11:**
(a)      Has plaintiff proved, by a preponderance of the evidence, that he is entitled to compensatory damages for his failure to intervene claim?

       Yes _____       No_____

(b)       If you answered YES to Question 11a, what amount of money should Plaintiff be awarded in compensatory damages that would fairly and adequately compensate Plaintiff for any injuries proximately caused by his failure to intervene claim that he suffered over and above what you have already compensated him for by your award, if any, on the previously considered claims for excessive force, false arrest, and retaliation?

       $_____

(c)      If you answered YES to any part of Question 10, but did not award any compensatory damages to plaintiff on his retaliation claim, please enter a nominal damages award of $1.

       $_____

**Question 12:**
Has plaintiff proved, by a preponderance of the evidence, that he is entitled to punitive damages for his failure to intervene claim by:

    a.   Sergeant Bernard Buckner:       Yes _____       No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

b.  Police Officer Steven O'Shea:        Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

d.  Police Officer Joseph Riccardi, Jr.:   Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff: _____

*(Please proceed to Question 13)*

**Question 13**:

**Assault**: Has plaintiff proved by a preponderance of the evidence that Mr. Kosmidis was subjected to assault without justification on September 15, 2017, by:

a. Sergeant Bernard Buckner:          Yes _____          No _____

b. Police Officer Steven O'Shea:          Yes _____          No _____

c. Police Officer Alexander Velez, Jr.:  Yes _____          No _____

d. Police Officer Joseph Riccardi, Jr.:  Yes _____          No _____

*If you answered YES to either Question 13a, 13b, 13c, or 13d, proceed to Question 14.*
*If you answered NO to all parts of Question 13, proceed to Question 15.*

**Question 14:**

(a)      Has plaintiff proved, by a preponderance of the evidence, that he is entitled to compensatory damages for his assault claim?

          Yes _____          No_____

(b)      If you answered YES to Question 14a, what amount of money should Plaintiff be awarded in compensatory damages that would fairly and adequately compensate Plaintiff for any injuries proximately caused by his assault claim that he suffered over and above what you have already compensated him for by your award, if any, on the previously considered claims for excessive force, false arrest, retaliation, and failure to intervene claims?  If you award damages on Plaintiff's state law assault claim, the Port Authority of New York and New Jersey will be jointly liable for those damages as well.

          $_____

(c)      If you answered YES to any part of Question 13, but did not award any compensatory damages to plaintiff on his assault claim, please enter a nominal damages award of $1.

          $_____

*(Please proceed to Question 15)*

9

**Question 15**:
**Battery**: Has plaintiff proved by a preponderance of the evidence that Mr. Kosmidis was subjected to battery without justification on September 15, 2017, by:

    e.  Sergeant Bernard Buckner:      Yes _____      No _____

    f.  Police Officer Steven O'Shea:    Yes _____      No _____

    g.  Police Officer Alexander Velez, Jr.:  Yes _____      No _____

    h.  Police Officer Joseph Riccardi, Jr.:  Yes _____      No _____

*If you answered YES to either Question 15a, 15b, 15c, or 15d, proceed to Question 16.*
*If you answered NO to all parts of Question 15, proceed to the last page of the verdict sheet.*

**Question 16:**
(a)     Has plaintiff proved, by a preponderance of the evidence, that he is entitled to compensatory damages for his battery claim?

      Yes _____      No_____

(b)     If you answered YES to Question 16a, what amount of money should Plaintiff be awarded in compensatory damages that would fairly and adequately compensate Plaintiff for any injuries proximately caused by his battery claim that he suffered over and above what you have already compensated him for by your award, if any, on the previously considered claims for excessive force, false arrest, retaliation, failure to intervene, and assault claims?  If you award damages on Plaintiff's state law battery claim, the Port Authority of New York and New Jersey will be jointly liable for those damages as well.

      $_____

(c)    If you answered YES to any part of Question 15, but did not award any compensatory damages to plaintiff on his battery claim, please enter a nominal damages award of $1.

      $_____

*(Please proceed to the last page, page 11)*

10

**You have completed all questions.  Please proceed to the signature line below.**

**SIGNATURE LINE**

Foreperson and other jurors, please sign and date the verdict sheet.  Then, without disclosing your verdict, advise the Marshal, that you have reached a verdict and are ready to return to the courtroom for the announcement of your verdict.

_____        _____
Foreperson

_____        _____

_____        _____

_____        _____

_____        _____

Dated:        _____

11

**Court Exhibit 6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATHINA KOSMIDIS as executrix of the estate of CONSTANTINO KOSMIDIS,<br><br>                  Plaintiff,<br><br>      -against-<br><br>THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, et al.,<br><br>                Defendants. | Case No. 18-cv-08413 (JLR) |

JENNIFER L. ROCHON, United States District Judge:

**<u>JURY INSTRUCTIONS</u>**

# TABLE OF CONTENTS

I.      GENERAL INSTRUCTIONS ................................................................................... 1

    A.      Introductory Remarks ................................................................................... 1

    B.      Role of the Court ........................................................................................... 1

    C.      Role of the Jury ............................................................................................. 2

    D.      Role of Counsel ............................................................................................. 2

    E.      Sympathy or Bias .......................................................................................... 3

    F.      Burden of Proof ............................................................................................ 4

    G.      What Is and Is Not Evidence ....................................................................... 5

    H.      Direct and Circumstantial Evidence ........................................................... 6

    I.      Witness Credibility ....................................................................................... 7

    J.      Prior Inconsistent Statement ........................................................................ 9

    K.      Use of Deposition Testimony .................................................................... 10

    L.      Preparation of Witnesses ............................................................................ 10

II.     SUBSTANTIVE INSTRUCTIONS ...................................................................... 10

    A.      Section 1983 ................................................................................................ 11

        1.      First Element – Action under Color of State Law ............................. 12

        2.      Second Element – Deprivation of a Federal Right ........................... 12

            i.      Deprivation of a Federal Right: False Arrest ......................... 14

            ii.      Deprivation of a Federal Right: Excessive Force ................. 16

            iii.      Deprivation of a Federal Right: First Amendment Retaliation ...................................................................................... 18

            iv.      Deprivation of a Federal Right: Failure to Intervene ............ 19

        3.      Third Element -- Proximate Cause .................................................... 19

    B.      State Law Claim for False Arrest ............................................................... 20

    C.      Stipulation of Facts .................................................................................... 20

    D.      Permissive Adverse Inference .................................................................... 20

III.    DAMAGES .............................................................................................................. 21

    A.      Compensatory Damages ............................................................................. 22

    B.      Multiple Defendants and Multiple Claims – Avoidance of Double Recovery ..... 23

    C.      Nominal Damages ....................................................................................... 24

    D.      Punitive Damages ....................................................................................... 24

IV.     DELIBERATIONS OF THE JURY ...................................................................... 26

    A.      Selection and Duties of Foreperson .......................................................... 26

        B.      Right to See Exhibits and Hear Testimony; Communication with the Court ....... 26

        C.      Notes ................................................................................................................. 27

        D.      Duty to Deliberate; Unanimous Verdict ........................................................... 27

        E.      Verdict Form ..................................................................................................... 28

        F.      Return of Verdict ............................................................................................. 29

V.      CONCLUSION ............................................................................................................ 29

# I.   GENERAL INSTRUCTIONS

## A.   Introductory Remarks

Members of the jury, I will now instruct you as to the law that governs this case.  You have been handed a copy of the instructions I will read.  You should feel free to read along or to just listen to me.  You will be able to take your copy of these instructions into the jury room.

Listening to these instructions may not be easy because they are long and extensive.  It is important, however, that you listen carefully and concentrate.  You'll notice that I'm reading these instructions from a prepared text.  It would be more lively, no doubt, if I just improvised.  But it's important that I not do that.  The law is made up of words, and those words are very carefully chosen.  So, when I tell you the law, it's critical that I use exactly the right words.

You have now heard all of the evidence in the case as well as the final arguments of the parties.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in the case.

There are three parts to these instructions.  First, I'm going to give you some general instructions about your role, and about how you are to decide the facts of the case.  Most of these instructions would apply to just about any trial.  Second, I'll give you some specific instructions about the legal rules applicable to this particular case.  Third, I'll give you some final instructions about procedures and deliberations.

## B.   Role of the Court

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

1

You must not substitute your own notions or opinions of what the law is or what you think it ought to be.  You are to consider these instructions together as a whole; in other words, you are not to isolate or give undue weight to any particular instruction.

### C.    Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts.  You evaluate the evidence.  You determine the credibility of the witnesses.  You resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Do not conclude from any of my rulings on objections or anything else I have done during this trial that I have any view as to the credibility of the witnesses or how you should decide the case.  Any opinion I might have regarding the facts is of absolutely no consequence.

It is your sworn duty, and you have taken the oath as jurors, to determine the facts and to render judgment impartially and fairly, solely on the evidence in this case and the applicable law.

### D.    Role of Counsel

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible.  It is my job to rule on those objections.  Therefore, why an objection was made or why I ruled on it the way I did is not your concern.  You should draw no inference from the fact that an attorney objects to any evidence.  Nor should you draw any inference from the fact that I might have sustained or overruled an objection.  If I sustained the objection, you may not consider the testimony or exhibit at issue; if I overruled the objection, you may consider the testimony or exhibit just as you would any other evidence in the case.

The personalities and the conduct of counsel in the courtroom are not in any way at issue. If you formed opinions or had reactions of any kind to the lawyers here, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, those opinions or reactions should not enter into your deliberations.

During the course of the trial, I may have had to correct the presentation of an attorney, for example, to ask them to rephrase a question. You should draw no inference against the attorney or the client. It is the duty of the attorneys to advocate on behalf of their clients.

From time to time, the lawyers and I have had conferences out of your hearing. These conferences involved procedural and other legal matters, and should not enter into your deliberations at all.

### E.      Sympathy or Bias

You must evaluate the evidence calmly and objectively, without prejudice or sympathy. You must be completely fair and impartial. Your verdict must be based solely on the evidence presented at this trial, or the lack of evidence.

You may not consider, in deciding the facts of the case, any personal feelings you may have about the race, religion, national origin, gender, age, sexual orientation, disability, or physical appearance of any party or witness. It is equally improper for you to allow any personal feeling that you might have about the nature of the claims or defenses to influence you in any way. The parties in this case are entitled to a trial free from prejudice and bias. Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

The case should be decided by you as an action between parties of equal standing in the community, of equal worth, and holding the same or similar stations in life. The individual defendants are not to be favored or disfavored because they are members of the Port Authority

3

Police Department, nor is the plaintiff or the plaintiff's decedent to be favored or disfavored because of their status, employment, or background.  Similarly, the Port Authority of New York and New Jersey, which is a governmental entity, is entitled to stand equal before the law.  All parties are entitled to the same fair trial by you.

F.     **Burden of Proof**

At various times in these instructions I will use the term "burden of proof" in order to inform you which party has the burden of proof on a particular claim or a particular issue.  As this is a civil case, the standard of proof is a preponderance of the evidence.

The party who has the burden of proof on a particular issue has the burden of establishing their position on that issue by a preponderance of the evidence. If you conclude that the party who has the burden of proof on an issue has failed to establish their position by a preponderance of the evidence, you must decide against that party on that issue.

What does a "preponderance of the evidence" mean?  To establish by a preponderance of evidence means to prove something is more likely so than not so.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.  In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If you find that the credible evidence on a given issue is evenly divided between the parties, then you must decide that issue against the party having this burden of proof.  That is because the party bearing this burden must prove more than simple equality of evidence – the party must prove the element at issue by a preponderance of the evidence.  On the other hand, the party with this

burden of proof need prove no more than a preponderance of the evidence.  So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof then that element will have been proved by a preponderance of the evidence.

One final note on the burden of proof: some of you may have heard of "proof beyond a reasonable doubt."  As I told you at the beginning of the trial, "beyond a reasonable doubt" is the standard of proof in a criminal trial.  It does not apply to a civil case such as this and you should put it out of your mind.

### G.      What Is and Is Not Evidence

In determining the facts, you must rely upon your own recollection of the evidence.  The evidence in this case is the sworn testimony of the witnesses and the exhibits received in evidence.

The only exhibits that are evidence in this case are those that were received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness's recollection.  Some exhibits have redactions on them, or places where the text has been blocked out.  You should not concern yourself with what was redacted, nor why anything was redacted from a document.

As I told you at the start of this case, statements and arguments by the lawyers are not evidence, because the lawyers are not witnesses.  What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict.  If your recollection of the facts differs from the lawyers' statements, however, it is your recollection that controls.

For the same reasons, you are not to consider a lawyer's questions, restatements of exhibits, or summarizing of the witness's testimony as evidence.  It is the witnesses' answers to those

questions, evaluated in the context of the question asked, or the exhibits themselves that are evidence.  Similarly, any statements that I may have made do not constitute evidence.  It is for you alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.

Finally, this means, of course, that anything you may have heard or read outside of this courtroom – on the internet, in the news media, or anywhere else – may play no role in your deliberations.  Your decision in this case must be made solely on the evidence presented at trial.

### H.    Direct and Circumstantial Evidence

Generally, there are two types of evidence that you may consider in reaching your verdict. One type of evidence is direct evidence.  Direct evidence is testimony by a witness about something he or she knows by virtue of his or her own senses – something the witness has seen, felt, touched, or heard.  For example, if a witness testified that when he or she left the house this morning, it was raining, that would be direct evidence about the weather.  Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  For example, assume that when you came into the courthouse this morning the sun was shining and it was a nice day.  Assume that the courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone walked in with an umbrella, which was dripping wet.  Then a few minutes later another person entered with a wet raincoat.  Now, you cannot look outside of the courtroom and you cannot see whether or not it is raining.  So, you have no direct evidence of that fact.  But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason, experience, and common sense from one established fact the existence or non-existence of some other fact.  As you can see, the matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven.  Many material facts – such as what a person was thinking or intending – are not easily proven by direct evidence.  Proof of such matters may be established by circumstantial evidence.

Circumstantial evidence is as valuable as direct evidence.  The law makes no distinction between direct and circumstantial evidence.

There are times when different inferences may be drawn from the evidence.  The plaintiff asks you to draw one set of inferences.  The defendants ask you to draw another.  It is for you, and for you alone, to decide what inferences you will draw.

## I.     Witness Credibility

You have had the opportunity to observe the witnesses.  It is now your job to decide how believable each witness was in his or her testimony.  You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, the relationship of the witness to the controversy and the parties, the witness's bias or impartiality, the reasonableness of the witness's statement, the strength or weakness of the witness's recollection viewed in the light of all other testimony, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given and all of the other evidence in the case.  How did the witness appear?  Was the witness candid, frank, and forthright; or, did the witness seem to be evasive or suspect in some way?  How did the way the witness testified on direct examination compare with how the witness testified on cross-examination?  Was the witness consistent or contradictory?  Did the witness appear to know what he or she was talking about?  Did the witness strike you as someone who was trying to report his or her knowledge accurately?  These are examples of the kinds of common-sense questions you should ask yourselves in deciding whether a witness is, or is not, truthful.  Often it is not what a person says but how he or she says it that moves us.

In passing upon the credibility of a witness, you may take into account any inconsistencies or contradictions as to material matters in his or her testimony.  You should also take into account any evidence that the witness who testified may benefit in some way from the outcome in this case.  Likewise, you should note any evidence of hostility or affection that the witness may have towards one of the parties.  Such bias or interest in the outcome creates a motive to testify falsely.  It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony and bear that factor in mind when evaluating the credibility of the testimony.

This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely.  It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

If you find that any witness has willfully testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety.  On the other hand, even if you find that a witness has testified falsely about one matter, you may reject as false that portion of his or

her testimony and accept as true any other portion of the testimony which you find credible or which you may find corroborated by other evidence in this case.  A witness may be inaccurate, contradictory, or even untruthful in some aspects, and yet be truthful and entirely credible in other aspects of his or her testimony.

You have heard testimony from witnesses who are police officers.  You should not give the testimony of a police officer any more or less weight solely for that reason.  You must evaluate a police officer's testimony in the same way that you would evaluate the testimony of any other witness.

The ultimate question for you to decide in passing upon credibility is: did the witness tell the truth before you?  It is for you to say whether his or her testimony at this trial was truthful in whole or in part.

**J.      Prior Inconsistent Statement**

You have heard evidence that certain witnesses may have made statements on earlier occasions which counsel argue are inconsistent with their trial testimony.  If you find that a witness made an earlier statement that conflicts with that witness's trial testimony, you may consider that fact in deciding how much of the trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so, how much, if any, weight to be given to the inconsistent statement in determining whether to believe all or part of the witness'

testimony.

### K.    Use of Deposition Testimony

Some of the testimony before you is in the form of depositions which have been received in evidence.  A deposition is simply a procedure where the attorneys for one side may question a witness or an adversary party under oath before a court stenographer prior to trial.  This is part of the pretrial discovery process, and each side is entitled to take depositions.  You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at this trial.

### L.    Preparation of Witnesses

You have heard evidence that certain witnesses may have prepared with their lawyers for appearing in court today.  Although you may consider that fact when you are evaluating a witness's credibility, I am instructing you that there is nothing unusual or improper about a witness meeting with lawyers before testifying.  Indeed, it would be unusual for a lawyer to call a witness to testify without such preparation.

## II.    SUBSTANTIVE INSTRUCTIONS

I will turn now to my instructions on the substantive law to be applied to this case.

This is a civil case with claims brought by the plaintiff against the defendants. Parties who bring claims are called plaintiffs. The original plaintiff in this case was Constantino Kosmidis.  He passed away in December 2021 for reasons unrelated to the lawsuit, and his wife, Athina Kosmidis, has stepped in as plaintiff, as executor of his estate.  Mr. Kosmidis is now referred to as plaintiff's decedent.

After a plaintiff brings claims, the defendants are then called upon to respond to the claims. The individual defendants in this case are Port Authority Police Sergeant Bernard Buckner, Port

10

Authority Police Officer Steven O'Shea, Port Authority Police Officer Alexander Velez, Jr., and Port Authority Police Officer Joseph Riccardi, Jr. (also sometimes referred to as "the individual defendants"). These individual defendants are employed by the final defendant, the Port Authority of New York and New Jersey (the "Port Authority"), which is a governmental entity.

You should consider plaintiff's claims against each of the defendants separately. Each defendant is entitled to a fair consideration of the evidence relating to that defendant, and is not to be prejudiced by any finding you make for or against any other defendant.

I will now discuss each of the claims in this case and the elements of each of these claims.

**A.    Section 1983**

Plaintiff asserts claims under a federal civil rights law, 42 U.S.C. § 1983, or "Section 1983" for short. Section 1983 provides a remedy for individuals who have been deprived of their federal constitutional rights under color of state law. Section 1983 states, in relevant part that:

> Every person who, under color of [state law], subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the [United States] Constitution and [federal] laws, shall be liable to the party injured [for damages].

Section 1983 creates a form of liability in favor of people who have been deprived of rights secured to them by the United States Constitution. Section 1983 itself does not establish or create any federally protected right. Rather, it is the statute that allows people to enforce rights guaranteed to them by the United States Constitution, including their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, to be free from unlawful arrest, excessive force, or a violation of their right to free speech. Plaintiff alleges that the defendants deprived Mr. Kosmidis of his constitutional right to be free from false arrest and the use of excessive force under the Fourth and Fourteenth Amendments, and to be free from retaliation based on his First Amendment rights. Defendants deny plaintiff's claims.

11

To establish claims under Section 1983, plaintiff must demonstrate, by a preponderance of the evidence, the following three elements:

First, that the acts complained of were committed by the defendant acting under color of state law;

Second, that this conduct deprived the plaintiff – or, here, plaintiff's decedent - of rights protected by the United States Constitution or laws of the United States; and

Third, that the defendant's conduct was a proximate cause of the injuries and damages sustained by the plaintiff's decedent.

I will now explain each of these elements in greater detail.

### 1.      First Element – Action under Color of State Law

As to the first element — whether the individual defendants were acting under color of state law — I instruct you that there is no dispute in this case that, during their interactions with Mr. Kosmidis, the individual defendants were acting as on-duty members of the Port Authority Police Department, and that they were therefore acting under color of state law. Plaintiff has therefore established this element, and you do not have to consider it.

### 2.      Second Element – Deprivation of a Federal Right

The second element that plaintiff must prove by a preponderance of the evidence is that the defendant you are considering deprived the plaintiff of a right protected by the United States Constitution.  Here the plaintiff alleges that the defendants deprived Mr. Kosmidis of three federal rights – the right to be free from excessive force under the Fourth Amendment, the right to be free from false arrest under the Fourth Amendment, and the right to be free of retaliation for exercising his First Amendment freedom of speech.

I will detail the elements of each of these alleged Constitutional violations in a few moments, but first, generally speaking, in order for plaintiff to establish this element of a Section 1983 claim, a plaintiff must prove two things by a preponderance of the evidence with respect to each defendant:

First, the plaintiff must prove by a preponderance of the evidence that the defendant you are considering took actions that the plaintiff claims violated Mr. Kosmidis's Constitutional rights.

The law imposes liability only upon a defendant who "subjects, or causes to be subjected" any person to the deprivation of a federal right.  Thus, in order for the plaintiff to prevail on his claims, there must be some evidence of personal involvement by the defendant you are considering.  Personal involvement may be established by a showing of direct participation in the Constitutional violation or indirect participation such as ordering or helping others to do the unlawful acts.  As you will be instructed further, a defendant may also be liable for failure to intervene if the officer observes a Constitutional violation and has sufficient time and ability to act to prevent it, but does not.  Therefore, you must first make a determination of personal involvement by the defendant you are considering in the constitutional violations alleged by the plaintiff.  If you find that a defendant was not personally involved in the deprivation of Mr. Kosmidis's constitutional rights, then you must find in favor of that defendant on that alleged violation.  If, however, you find that a defendant was personally involved in the deprivation of the Mr. Kosmidis's constitutional rights, then you must go on to determine whether the plaintiff has proven the other elements of the claims regarding the deprivation of Mr. Kosmidis's Constitutional rights against that defendant.  Although there are multiple defendants in this case, each defendant is entitled to fair, separate, and individual consideration without regard to your decision as to the other defendants.

Section 1983 does not require the plaintiff to demonstrate that the defendant you are considering acted with the specific intent to violate Mr. Kosmidis's federally protected rights. It only requires that the effects of defendant's actions with respect to plaintiff were not accidental effects of otherwise lawful conduct.

Second, the plaintiff must prove that the defendant's conduct caused Mr. Kosmidis to suffer the loss of a Constitutional right.

I will now discuss in more detail the federal rights that plaintiff alleges Mr. Kosmidis was deprived of by each defendant. You have heard both plaintiff's and defendants' versions of what happened in this case, and it is up to you to first decide what actually occurred on September 15, 2017 based on the evidence. With that determination in mind, you should then consider, under the law as I am about to instruct you, whether the plaintiff has established that the defendants violated Mr. Kosmidis's Constitutional rights.

### i.        Deprivation of a Federal Right: False Arrest

Plaintiff claims that Mr. Kosmidis's rights were violated because Mr. Kosmidis was falsely arrested by the defendants when he was handcuffed. The individual defendants contend that they acted lawfully under the circumstances.

The only contested issue for this claim is whether Mr. Kosmidis's detention was justified by probable cause. Because probable cause is an affirmative defense, the defendants bear the burden of proving by a preponderance of the evidence that the arrest was justified by probable cause. If you find that the defendants lacked probable cause to arrest Mr. Kosmidis, you must find that they deprived Mr. Kosmidis of a federal Constitutional right to be free of false arrest under the Fourth Amendment.

<u>What is probable cause?</u>

14

Probable cause exists when, at the time of the arrest, the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable prudence to believe that the person to be arrested has committed or is committing a crime or offense. The standard is objective, and the officers' subjective beliefs and motivations are irrelevant to the analysis.  The existence of probable cause must be determined on the basis of the information collectively known by the police officers who made the arrest at the time of the arrest.

In order to determine that probable cause existed here, the defendants must prove that there was probable cause for the defendants to believe that Mr. Kosmidis had committed a violation under Section 240.20(1) or (3) of the Penal Law of the State of New York.  Under New York law, a police officer has the right to arrest a person without a warrant whenever the officer reasonably believes that such person has committed an offense in the presence of the officer. The individual defendants assert that there was probable cause to arrest Mr. Kosmidis for the offense of disorderly conduct under two subsections of Section 240.20 of the New York Penal Law.  There are two elements to an offense of disorderly conduct.  First, the person must have the intent to cause public inconvenience, annoyance or alarm, or recklessly created a risk thereof. An act is intentional if it is done voluntarily and deliberately and not because of mistake or accident.  An act is reckless if done in conscious disregard of its known probable consequences.  Second, the person must engage in fighting or in violent, tumultuous or threatening behavior, under Section 240.20(1); or, in a public place, use abusive or obscene language, or make an obscene gesture, under Section 240.20(3).  There must be a public dimension of the offensive conduct.  It must extend beyond a private exchange between individuals.

15

In evaluating whether there was probable cause, it is not relevant whether Mr. Kosmidis was in fact guilty of this offense or any offense. The fact that Mr. Kosmidis was not ultimately issued a summons for disorderly conduct does not by itself mean that there was no probable cause at the time of his arrest. In addition, whether charges were ultimately brought or not brought against Mr. Kosmidis is not determinative as to whether there was probable cause at the time of the arrest.

Finally, any conduct that Mr. Kosmidis engaged in after he had already been arrested cannot provide the defendants with probable cause to arrest him.

To recap: If, at the time that the individual defendants arrested Mr. Kosmidis, there was probable cause to believe that he had committed or was committing the offense of disorderly conduct, as I have explained it to you, then the arrest was reasonable and Mr. Kosmidis's rights were not violated. But if the defendants lacked probable cause for the arrest, and all the other elements I have described are satisfied, then they violated Mr. Kosmidis's constitutional rights to be free of unlawful arrest.

### ii.      Deprivation of a Federal Right: Excessive Force

Plaintiff also contends that the individual defendants subjected Mr. Kosmidis to the use of excessive force, and that therefore he was deprived of his rights guaranteed by the Fourth Amendment to the United States Constitution. The individual defendants deny these allegations and contend that they did not use excessive force. It is for you to decide whose version of events you believe.

The Constitution protects people from being subjected to unreasonable uses of force by police officers. A use of force can be applied through any physical means, such as, for example, blows inflicted, pushing, or through the use of handcuffs. Under the Fourth Amendment, a police officer may only use such force as is "objectively reasonable" under all of the circumstances.

16

Reasonable force means the amount of force a reasonable and prudent police officer would use under the same facts and circumstances, without considering the intent or motivation of the particular defendant officer who actually used the force. In other words, even if the individual defendants acted with evil intent, the force used will not be considered excessive if it was reasonable under all of the surrounding circumstances. On the other hand, if the individual defendants acted with good intent and in good faith, if the force used was unreasonable given the surrounding circumstances, then it was a Constitutional violation.

In determining whether the defendant you are considering used unreasonable force in this case, you should consider the facts known to the defendant at the time, and other relevant circumstances at the time any force was used, including the severity of the alleged offense at issue and whether Mr. Kosmidis posed an immediate threat to the safety of the defendants or others. Because police officers are often forced to make split second judgments about the amount of force that is necessary in a given situation, you must judge the reasonableness of the force used from the perspective of a reasonable police officer on the scene at the time, rather than with the 20/20 vision of hindsight.

You may consider but do not have to determine, whether the defendant had less intrusive alternatives available or whether there were less harmful types of force available. The defendant need only to have acted within that range of conduct identified as objectively reasonable. If you find that the amount of force used was greater than a reasonable person would have employed, the plaintiff will have established that defendant exercised excessive force. If you find that the amount of force used was not greater than a reasonable person would have employed, then you must find against the plaintiff on the claim of excessive force.

In making this determination you must keep in mind that a police officer is not permitted to use any force beyond that reasonably necessary to accomplish a lawful purpose. It is not necessary that the force used by the individual defendants caused serious long-lasting harm to Mr. Kosmidis to establish liability. If you find that the force used by the individual defendants exceeded the force (if any) reasonably needed under the factual circumstances, then you must find the individual defendants liable for excessive force under the Fourth Amendment. The severity of the injury, if any, is an issue as to damages, not liability.

### iii.    <u>Deprivation of a Federal Right: First Amendment Retaliation</u>

Plaintiff also alleges the individual defendants retaliated against Mr. Kosmidis for exercising his right to free speech under the First Amendment to the U.S. Constitution.

To prevail on a First Amendment retaliation claim under Section 1983 plaintiff must show that: (1) Mr. Kosmidis had a right protected by the First Amendment; (2) the individual defendants' adverse actions – including in arresting or using excessive force with respect to Mr. Kosmidis -- were motivated, or substantially caused, by Mr. Kosmidis's exercise of that right; and (3) Mr. Kosmidis's speech was adversely affected by the government's retaliation or he suffered some other concrete harm.  An adverse action is defined as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. Speech directed at police officers is protected under the First Amendment unless it is likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

The existence of probable cause defeats a First Amendment claim that a police officer's arrest was based on retaliation for engaging in protected speech.  Therefore, if you find that the individual defendants have proven that they had probable cause to arrest Mr. Kosmidis, you must

find that plaintiff has not proven the First Amendment retaliation claim based on false arrest. Likewise, if you find that the individual defendants did not use excessive force, you must find that the plaintiff has not proven the First Amendment retaliation claim based on excessive force.

### iv.     Deprivation of a Federal Right: Failure to Intervene

In addition to alleging that each of the individual defendants themselves used excessive force upon, falsely arrested, and/or engaged in First Amendment retaliation against Mr. Kosmidis, plaintiff has also alleged that each was aware of the commission of each of these Constitutional violations upon Mr. Kosmidis, and that they failed to intervene to prevent the commission of these Constitutional violations by their police colleagues.  Police officers and their supervisors are under a duty to intercede and prevent fellow officers from subjecting a person to violations of the person's Constitutional rights, and may be held liable for their failure to do so if they observe a Constitutional violation and have sufficient time and ability to act to prevent it.

You thus must find the individual defendant you are considering liable on this claim if you find that plaintiff has proven that another defendant violated Mr. Kosmidis's Constitutional rights, and the defendant you are considering had a reasonable opportunity to intervene to prevent any Constitutional violation upon Mr. Kosmidis by their colleagues in the Port Authority Police Department, and that the defendant failed to do so.

### 3.     Third Element -- Proximate Cause

The third element that plaintiff must prove with respect to a Section 1983 claim is that the individual defendants' conduct was a proximate cause of the injuries sustained by Mr. Kosmidis. An act is a proximate cause of compensable injury if it was a substantial factor in bringing about Mr. Kosmidis's injury, and if the injury was a reasonably foreseeable consequence of the individual defendants' conduct.

19

The question is whether a reasonable person would regard the individual defendants' conduct as being a cause of the injury. If so, the conduct is a proximate cause.

That concludes the instructions on the federal claims.

### B.    State Law Claim for False Arrest

Mr. Kosmidis claims that the false arrest that he suffered under federal law also violates New York State law.  With exceptions not relevant here, New York and federal law are identical with regard to claims for false arrest, and plaintiff may not recover twice on his false arrest claim; therefore you will make only one determination on the verdict form regarding false arrest. Under a legal theory called respondeat superior, the defendant Port Authority will automatically be held jointly liable with that individual defendant for the compensatory or nominal damages, if any, you award on the false arrest claim.

### C.    Stipulation of Facts

A stipulation of facts is an agreement among the parties that a certain fact is true. You must regard such agreed facts as true. Here the parties have stipulated to the following:

> The parties stipulate that there is no existing video or surveillance footage that depicts any of the interactions between Mr. Kosmidis and the individual defendants that you have heard about, or that otherwise depicts Mr. Kosmidis from elsewhere within JFK Airport on September 15, 2017. An attempt was made by the parties to locate any such video footage, including any video footage from cameras controlled by the federal government that were at or near the location of the incident. The parties asked the federal government to produce any video footage related to the incident from video cameras at Kennedy Airport and were informed that no responsive video related to the incident could be located.

> The parties likewise attempted through subpoenas to the federal government to identify any federal employees who may have been involved with, or who may have witnessed, the events you have heard about. The federal government was also unable to identify anyone in response to the parties' subpoenas.

### D.    Permissive Adverse Inference

In this case, evidence has been received which the plaintiff contends shows that Officer O'Shea wrote up a criminal summons at or around the time of the incident between Mr. Kosmidis

and the individual defendants and that Sergeant Buckner ripped up the summons. If you find that plaintiff has proven by a preponderance of the evidence that Sergeant Buckner knew or should have known that litigation was going to result from the incident and that this evidence would be relevant to it, you may infer, though you are not required to do so, that if the summons had been produced in court, it would have been unfavorable to defendants. You may give any such inference, whatever force or effect as you think is appropriate under all the facts and circumstances here.

In making this determination, you may consider whatever facts that you deem to bear upon the issue, including whether Mr. Kosmidis asked for the summons not to be torn up in advance of it being torn up, whether an official process existed for voiding a summons that was not followed, and Sergeant Buckner's state of mind when he tore up the summons. This instruction applies only to the summons and not to the handwritten Aided Report.

## III.   DAMAGES

If plaintiff has proven by a preponderance of the evidence that the individual defendants are liable on one or more of plaintiff's claims, then you must determine the damages to which plaintiff is entitled.

There are three types of damages you may consider: compensatory damages, nominal damages, and punitive damages. I will discuss each in turn.

The fact that I am instructing you as to the proper measure of damages does not indicate any view of mine as to which party is entitled to your verdict in this case. Instructions as to the measure of damages are given for your guidance only in the event that you should find that plaintiff has proven each claim in accordance with my other instructions.

The verdict form I will give you will assist you in recording the determinations, if any, that you make as to damages.

A.       **Compensatory Damages**

The purpose of the law of damages is to award, as far as possible, sufficient damages to compensate a plaintiff for any injury and any loss proximately caused by the defendants' conduct. These are known as "compensatory damages." Compensatory damages seek to make a plaintiff whole—that is, to compensate the plaintiff for the damage suffered.

If you find for plaintiff with respect to any of the claims, then you must award plaintiff the sum that you find by a preponderance of the evidence will fairly and justly compensate plaintiff for any damages you find that were sustained as a direct result or as a reasonably foreseeable consequence of the defendants' conduct.

Compensatory damages are not only for out-of-pocket expenses that a plaintiff may have borne. A prevailing plaintiff is entitled to compensatory damages for loss of liberty, physical injury, pain and suffering, emotional and mental anguish, and shock and discomfort that the plaintiff suffered because of the defendant's conduct.  Loss of liberty is inherent in unlawful confinement.

The damages that you award must be fair and reasonable, neither inadequate nor excessive.  You should not award compensatory damages for speculative injuries, but only for those injuries that Mr. Kosmidis has actually suffered.  It is plaintiff's burden to prove the amount of Mr. Kosmidis's damages and to prove that the damages were caused by the defendant's actions. Your determination of damages must not be based on speculation or guesswork.

However, the law does not require a plaintiff to prove the amount of losses with mathematical precision. I cannot give you a yardstick by which to measure the dollar amount of pain or injury. You heard Mr. Kosmidis's testimony and the testimony of the other witnesses, and have seen the documentary evidence concerning damages.  If you award compensatory damages

on any particular claim you will have to determine, based on your common sense and experience, that amount of money that will fairly and reasonably make plaintiff whole or compensate plaintiff for the injuries and pain and suffering that Mr. Kosmidis sustained as a consequence of any acts that violated his rights.

You are to use your sound discretion in fixing an award of compensatory damages, drawing all reasonable inferences where you deem appropriate from the facts and circumstances in evidence. In sum, your award of compensatory damages, if any, should reasonably compensate plaintiff for such injury and damage as you find that Mr. Kosmidis has sustained.

### B.   Multiple Defendants and Multiple Claims – Avoidance of Double Recovery

It is important to note that if you find the individual defendants violated more than one of Mr. Kosmidis's rights, plaintiff is entitled to be compensated only for the injuries plaintiff actually suffered.  Thus, if the defendant violated more than one of Mr. Kosmidis's rights, but the resulting injury was no greater than it would have been had the defendants violated one of those rights, you should award an amount of compensatory or nominal damages no greater than you would award if defendants had violated only one of Mr. Kosmidis's rights.

However, if defendants violated more than one of Mr. Kosmidis's rights and you can identify separate injuries resulting from the separate violations, you should award an amount of compensatory damages equal to the total of the damages you believe will fairly and just compensate plaintiff for the separate injuries Mr. Kosmidis suffered.

In other words, any damage award for a second claim must be limited to the component of injury you find substantiated for this second claim, if any, over and above whatever you have already compensated by your awards for other claims.

23

As stated previously, plaintiff is not entitled to recover twice on his false arrest claim even though he alleges that the conduct violated both his state and federal rights.

If you decide that two or more of the defendants are liable for violating plaintiff's rights, then you must simply determine the overall amount of damages that will fairly and justly compensate plaintiff's injury, without breaking that figure down into individual percentages for which each defendant is liable.  Each individual who is liable is jointly and severally liable for the entire amount of compensatory or nominal damages.

### C.    Nominal Damages

If you return a verdict for the plaintiff, but find that plaintiff has failed to prove by a preponderance of the credible evidence that plaintiff is entitled to any actual compensatory damages, then you must return an award of damages in the sum of one dollar.  This is to show that liability has been proved and that Mr. Kosmidis has been deprived of a Constitutional right, but that plaintiff has not proven that Mr. Kosmidis suffered an actual injury as a result of that Constitutional deprivation.  This type of damages is called "nominal damages."

### D.    Punitive Damages

You may also, in your discretion, make an award of punitive damages against an individual defendant and not the Port Authority as an entity.  Punitive damages are awarded, in the discretion of the jury, to punish an individual defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like him from committing such conduct in the future. You may award punitive damages as a separate award in addition to compensatory damages.

You may award the plaintiff punitive damages if you find that the acts or omissions of the individual defendant were done maliciously or wantonly. An act or failure to act is maliciously done if it is prompted by ill will or spite towards the injured person. An act or failure to act is

24

wanton if done with a reckless or callous disregard for the rights of the injured person. The plaintiff has the burden of proving, by a preponderance of the evidence, that the individual defendant you are considering acted maliciously or wantonly with regard to Mr. Kosmidis's rights.

If you find by a preponderance of the evidence that the individual defendant you are considering acted with malicious intent to violate Mr. Kosmidis's federal rights, or if you find that the individual defendant acted with a callous or reckless disregard of Mr. Kosmidis's rights, then you may award punitive damages against that individual defendant. An award of punitive damages, however, is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.

In making this decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future. Thus, in deciding whether to award punitive damages against an individual defendant, you should consider whether that defendant may be adequately punished by an award of actual damages only, or whether the conduct is so extreme and outrageous that actual damages are inadequate to punish the wrongful conduct. You should also consider whether actual damages, standing alone, are likely to deter or prevent this individual defendant from similar wrongful conduct in the future, or whether punitive damages are necessary to provide deterrence. Finally, you should consider whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those the defendant may have committed.

If you decide to award punitive damages, these same purposes should be kept in mind as you determine the appropriate amount of money to be awarded as punitive damages. That is, in fixing the amount to be awarded, you should consider the degree to which a defendant should be

punished for his wrongful conduct, and the degree to which an award of one amount or another will deter a defendant or persons like him from committing wrongful acts in the future.

## IV.   DELIBERATIONS OF THE JURY

Ladies and gentlemen of the jury, that concludes the substantive portion of my instructions to you.  You are about to go into the jury room and begin your deliberations.  I will now give you a few final instructions on those deliberations.

### A.   Selection and Duties of Foreperson

It is customary for Juror Number 1 to serve as the foreperson, and that is what we will do here.  The foreperson doesn't have any more power or authority than any other juror, and her vote or opinion doesn't count for any more than any other juror's vote or opinion.  The foreperson is merely your spokesperson to the Court.  The foreperson will send out any notes, and when the jury has reached a verdict, the foreperson will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

### B.   Right to See Exhibits and Hear Testimony; Communication with the Court

All of the exhibits admitted into evidence will be sent to the jury room with you.  If you want any of the testimony read, you may request that.  As I stated previously, you may also request if you would like to review the video of any of the responses by Mr. Kosmidis in Greek before the translation was provided by the interpreter.  However, you must accept the translation of the official translator with respect to any Greek testimony.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of the testimony.

Your requests for testimony – in fact any communications with the Court – should be made to me in writing, signed, dated, and timed by your foreperson, and given to one of the marshals.

Please make any notes as clear and precise as possible.  Do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached and announced in open court by your foreperson.

### C.    Notes

Some of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are solely to assist you as an aid to your memory.  Do not share your notes with other jurors during deliberations.  Notes that any of you may have taken may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

### D.    Duty to Deliberate; Unanimous Verdict

Shortly, you will retire to decide the case.  You are to discuss the case only when all jurors are present.  A majority of jurors together are only a gathering of individuals. Only when all jurors are present do you constitute the jury, and only then may you deliberate.

You must base your verdict solely on the evidence and these instructions as to the law, and you are obliged on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with the particular law in question.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement.  Each of you must decide the case for himself or herself, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous.   Discuss and weigh your respective opinions

27

dispassionately, without regard to sympathy, without regard to prejudice or favor for any party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender his or her conscientious beliefs solely for the purpose of returning a unanimous verdict.

Remember at all times, you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case. Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any way or manner any suggestion or hint as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

If you are divided, do *not* report how the vote stands and if you have reached a verdict do not report what it is until you are asked in open court.

### E.    Verdict Form

In a few moments, I will give you the verdict form with the questions for you to answer and you will retire to deliberate on your decision. As I stated, the questions are not to be taken as any indication that I have any opinion as to how they should be answered. I have no such opinion, and even if I did, it would not be binding on you.

You should answer every question except where the verdict form indicates otherwise.  You should also proceed through the questions in the order in which they are listed and follow all instructions.  Remember, all answers must be unanimous.

**F.      Return of Verdict**

After you have reached a verdict, your foreperson will fill in the form that has been given to you, you will all sign and date it, and your foreperson will advise the marshal outside your door that you are ready to return to the courtroom.

Each of you must be in agreement with the verdict which is announced in court.  Once your verdict is announced and officially recorded, it cannot ordinarily be revoked.

## V.      CONCLUSION

In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors, consider all of the evidence, apply your common sense, and follow my instructions on the law, you will reach a fair verdict here.  Thank you for your time and attention.

29

**Court Exhibit 7**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

                          Plaintiff,

          -against-                                    Case No. 18-cv-08413 (JLR)

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

                          Defendants.

JENNIFER L. ROCHON, United States District Judge:

**VERDICT FORM**

**Court Exhibit 7**

**Question 1**:

**False Arrest:** Has plaintiff proved, by a preponderance of the evidence, that Mr. Kosmidis was subject to a false arrest under Section 1983/New York state law on September 15, 2017, keeping in mind that the defendants have the burden to prove probable cause, by:

a. Sergeant Bernard Buckner:         Yes _____        No _____

b. Police Officer Steven O'Shea:      Yes _____        No _____

c. Police Officer Alexander Velez, Jr.:  Yes _____     No _____

d. Police Officer Joseph Riccardi, Jr.:  Yes _____     No _____

*If you answered YES to either Question 1a, 1b, 1c, or 1d, proceed to Questions 2 and 3.*
*If you answered NO to all parts of Question 1, proceed to Question 4.*

**Question 2:**

(a)     Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's false arrest claim?

        Yes _____          No_____

(b)     If you answered YES to Question 2a, what amount of money should plaintiff be awarded in compensatory damages that would fairly and adequately compensate plaintiff for any injuries proximately caused by plaintiff's false arrest?

        $_____

(c)     If you answered YES to any part of Question 1, but you did not award any compensatory damages to plaintiff on plaintiff's false arrest claim, please enter a nominal damages award of $1.

        $_____

**Question 3:**

Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's false arrest claim by:

a. Sergeant Bernard Buckner:         Yes _____        No _____

        If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

b. Police Officer Steven O'Shea:      Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.   Police Officer Alexander Velez, Jr.:   Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.   Police Officer Joseph Riccardi, Jr.:   Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to Question 4)*

2

**Question 4**:
**Excessive Force**: Has plaintiff proved, by a preponderance of the evidence, that Mr. Kosmidis was subjected to excessive force under Section 1983 on September 15, 2017, by:

a.  Sergeant Bernard Buckner:           Yes _____       No _____

b.  Police Officer Steven O'Shea:        Yes _____       No _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____       No _____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____       No _____

*If you answered YES to either Question 4a, 4b, 4c, or 4d, proceed to Questions 5 and 6.*
*If you answered NO to all parts of Question 4, proceed to Question 7.*

**Question 5:**
(a)    Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's excessive force claim?

Yes _____         No _____

(b)    If you answered YES to Question 5a, please write the amount of compensatory damages on the line below that plaintiff has proven would fairly and adequately compensate plaintiff for any injuries proximately caused by defendant(s)' excessive force that Mr. Kosmidis suffered over and above what you have already compensated plaintiff for by your award, if any, on the previously considered claim for false arrest.

$_____

(c)    If you answered YES to any part of Question 4, but you did not award any compensatory damages to plaintiff on plaintiff's excessive force claim, please enter a nominal damages award of $1.

$_____

**Question 6:**
Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's excessive force claim by:

a.  Sergeant Bernard Buckner:           Yes _____       No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

b.  Police Officer Steven O'Shea:        Yes _____       No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to Question 7)*

4

**Question 7**:

**First Amendment Retaliation**: Has plaintiff established by a preponderance of the evidence that Mr. Kosmidis was subjected to retaliation for exercising his First Amendment right to free speech on September 15, 2017, by:

    a.  Sergeant Bernard Buckner:         Yes _____        No _____

    b.  Police Officer Steven O'Shea:     Yes _____        No _____

    c.  Police Officer Alexander Velez, Jr.:  Yes _____        No _____

    d.  Police Officer Joseph Riccardi, Jr.:  Yes _____        No _____

*If you answered YES to either Question 7a, 7b, 7c, or 7d, proceed to Question 8.*
*If you answered NO to all parts of Question 7, proceed to Question 10.*

**Question 8:**

(a)     Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's First Amendment retaliation claim?

       Yes _____        No_____

(b)     If you answered YES to Question 8a, what amount of money should plaintiff be awarded in compensatory damages that would fairly and adequately compensate plaintiff for any injuries proximately caused by defendant(s)' first amendment retaliation that Mr. Kosmidis suffered over and above what you have already compensated plaintiff for by your award, if any, on the previously considered claims for excessive force and false arrest?

       $_____

(c)     If you answered YES to any part of Question 7, but did not award any compensatory damages to plaintiff on plaintiff's retaliation claim, please enter a nominal damages award of $1.

       $_____

**Question 9:**

Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's First Amendment retaliation claim by:

    a.  Sergeant Bernard Buckner:         Yes _____        No _____

          If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

5

b.  Police Officer Steven O'Shea:          Yes _____          No _____

> If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____          No _____

> If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____          No _____

> If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to Question 10)*

6

**Question 10**:
**Failure to Intervene**: Has plaintiff proved, by a preponderance of the evidence, that a defendant listed below failed to intervene to prevent excessive force, false arrest, or retaliation by at least one of the <u>other</u> defendants on September 15, 2017?  If you answered YES as to a particular defendant for Question 1, 4, or 7, you may <u>not</u> also answer YES for that defendant for this Question.

    a.  Sergeant Bernard Buckner:      Yes _____        No _____

    b.  Police Officer Steven O'Shea:     Yes _____        No _____

    c.  Police Officer Alexander Velez, Jr.:  Yes _____        No _____

    d.  Police Officer Joseph Riccardi, Jr.:  Yes _____        No _____

*If you answered YES to either Question 10a, 10b, 10c, or 10d, proceed to Question 11.*
*If you answered NO to all parts of Question 10, **you have finished and please proceed to the last page of the verdict sheet and sign the verdict sheet.***

**Question 11:**
(a)    Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's failure to intervene claim?

        Yes _____        No_____

(b)    If you answered YES to Question 11a, what amount of money should plaintiff be awarded in compensatory damages that would fairly and adequately compensate plaintiff for any injuries proximately caused by defendant(s)' failure to intervene that Mr. Kosmidis suffered over and above what you have already compensated plaintiff for by your award, if any, on the previously considered claims for excessive force, false arrest, and retaliation?

        $_____

(c)    If you answered YES to any part of Question 10, but did not award any compensatory damages to plaintiff on plaintiff's failure to intervene claim, please enter a nominal damages award of $1.

        $_____

**Question 12:**
Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's failure to intervene claim by:

    a.  Sergeant Bernard Buckner:      Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

b.  Police Officer Steven O'Shea:        Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to the last page)*

**You have completed all questions.  Please proceed to the signature line below.**

**SIGNATURE LINE**

Foreperson and other jurors, please sign and date the verdict sheet.  Then, without disclosing your verdict, advise the Marshal, that you have reached a verdict and are ready to return to the courtroom for the announcement of your verdict.

_____          _____
Foreperson

_____          _____

_____          _____

_____          _____

_____          _____

Dated:        _____

9

**Court Exhibit 8**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATHINA KOSMIDIS as executrix of the estate of CONSTANTINO KOSMIDIS, | |
| Plaintiff, | |
| -against- | Case No. 18-cv-08413 (JLR) |
| THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, et al., | |
| Defendants. | |

JENNIFER L. ROCHON, United States District Judge:

## **SPECIAL VERDICT FORM**

**Court Exhibit 8**

**The Court requests that you answer the following questions.  All of the questions concern the incident on September 15, 2017 about which you heard evidence at trial.  Please answer whether defendants have proved each by a preponderance of the evidence.  Your answers to these questions must be unanimous.**

1. Were the Port Authority Police Officers notified that the decedent Constantino Kosmidis yelled and used abusive or obscene language directed at the Delta employees while he was a passenger on a flight from Greece to New York (John F. Kennedy International Airport)?

   YES _____   NO _____

2. Were the Port Authority Police Officers notified that the decedent Constantino Kosmidis physically touched Delta employee Ms. Carmen Dunphy in a threatening manner during the flight?

   YES _____   NO _____

3. Were the Port Authority Police Officers notified to meet decedent Constantino Kosmidis's flight at Delta's request for a disorderly passenger?

   YES _____   NO _____

4. Were the Port Authority Police Officers met by Delta employees at John F. Kennedy International Airport and informed of the Delta employees' interactions and observations of decedent Constantino Kosmidis during the flight?

   YES _____   NO _____

5. Were the Port Authority Police Officers asked to escort decedent Constantino Kosmidis off the flight by Delta Captain Atsalis?

   YES _____   NO _____

6. Did Port Authority Police Officers observe decedent Constantino Kosmidis yelling, cursing and moving his arms around when they arrived on the plane?

   YES _____   NO _____

7. Did Port Authority Police Officers observe decedent Constantino Kosmidis yelling and cursing in the ramp area near the terminal gate, which is a public space?

   YES _____   NO _____

8. Did Port Authority Police Officers observe decedent Constantino Kosmidis attempt to walk away from them multiple times after he was escorted off the plane?

YES _____   NO _____

9. Did Port Authority Police Officers observe decedent Constantino Kosmidis refuse to comply with their directives, including attempting to light a cigarette after he was instructed by the officers that he could not smoke in the ramp area?

YES _____   NO _____

10. Did Port Authority Police Officers observe decedent Constantino Kosmidis lunge toward defendant Sergeant Buckner in a threatening manner in the ramp area near the terminal gate requiring him to be handcuffed?

YES _____   NO _____

11. Did Port Authority Police Officers observe decedent Constantino Kosmidis fall to the ground as a result of the handcuffing process?

YES _____   NO _____

*(Please proceed to the last page, page 3)*

**You have completed all questions.  Please proceed to the signature line below.**

**SIGNATURE LINE**

Foreperson and other jurors, please sign and date this special verdict form.  Then advise the Marshal that you have completed the form and are ready to return to the courtroom for the announcement of your special verdict answers.

_____          _____
Foreperson

_____          _____

_____          _____

_____          _____

_____          _____

Dated:          _____

3

Constantino Kosmidis
May 10, 2019

1

STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------X
CONSTANTINO KOSMIDIS,

4
                       Plaintiff,

5          -against- 18-cv-8413(AJN)

6    THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
PORT AUTHORITY POLICE  SERGEANT BERNARD

7    BUCKNER, PORT AUTHORITY POLICE OFFICER STEVEN
O'SHEA; PORT AUTHORITY POLICE OFFICER ALEXANDER

8    VELEZ, JR.; PORT AUTHORITY POLICE OFFICER
JOSEPH RICCARDI, JR.; JOHN DOES; and RICHARD

9    ROES,

10                       Defendants.
     ----------------------------------------------X

11                       May 10, 2019
                        10:08 a.m.

12
                        4 World Trade Center

13                      New York, New York

14

15

16          VIDEOGRAPH DEPOSITION of CONSTANTINO

17   KOSMIDIS, the Plaintiff in the above-entitled

18   action, held at the above time and place,

19   pursuant to Notice, taken before Peter Toth, a

20   reporter and Notary Public within and for the

21   State of New York.

22

23

24

25

EXHIBIT
9
May 8, 2023

Constantino Kosmidis
May 10, 2019                                    2

1

2                    A P P E A R A N C E S

3    JEFFREY A. ROTHMAN, ESQ.
              Attorneys for Plaintiff
4             315 Broadway, Suite 200
              New York, New York 10007
5    BY:  JEFFREY A. ROTHMAN, ESQ.

6

7    PORT AUTHORITY OF NEW YORK AND NEW JERSEY
              Attorneys for Defendants
8             THE PORT AUTHORITY
              4 World Trade Center, 24th Floor
9             New York, New York 10007
     BY:  CHERYL ALTERMAN, ESQ.
10

11

12

13   ALSO PRESENT: Eleni Kourti, Interspeak

14   Translations,  George Frangos, James Soto,

15   videographer from US Legal, John Kosmidis

16

17

18

19

20

21

22

23

24

25



Page 112

1              C. Kosmidis

17        Q     The question was, when the plane

18   landed was your wife seated in the seat next

19   to the passenger who had elbowed you earlier

20   in the flight?

21        A     She was sitting, yes.

22        Q     Was she sitting next to that person

23   who had elbowed you earlier in the flight?

24        A     Yes, miss, yes.

25        Q     When the plane landed were any

Constantino Kosmidis
May 10, 2019                                    113

Page 113

1                    C. Kosmidis

2   announcements made?

3        A     I can't hear anything, the way I am

4   now, I was like that then.

5        Q     Once the plane landed did anyone

6   come onto the plane and approach you?

7        A     The question was when the plane

8   landed if somebody came in on the plane to

9   talk to me?

10       Q     Yes.

11       A     Nobody came on the plane.

12       Q     At the moment the plane landed did

13  anyone approach you and say, sir, you have to

14  come with us, or something to that effect?

15            MR. ROTHMAN:  Objection to the form

16       of the question.

17       A     When the ladder was taken down and

18  it was from my side of the plane this

19  gentleman came on the plane wearing federal

20  badges.  And they did not come right up to me,

21  they came -- they were about ten meters away.

22       Q     What color uniform were they

23  wearing?

24       A     Plain clothes.

25       Q     So they were wearings plain

Page 114

1                    C. Kosmidis

2      clothes, but you saw a federal badge hanging

3      from their chest?

4           A      Federal, the round one (In

5      English).

6           Q      Did it say United States on it?

7           A      I know how to identify a federal

8      agent with that badge; I'm not blind and I

9      know them.

10          Q      Did the -- how many federal agents

11     came onto the plane?

12          A      One was in the front, and the other

13     one was outside of the plane.  But the guy

14     that was in the front he did this indicating

15     like I want to talk to you.

16               MR. ROTHMAN:  Let the record

17          reflect that the interpreter who I

18          believe is not on the video and that only

19          the witness is on the video, the

20          interpreter was pointing at herself when

21          she said that.

22               INTERPRETER:  Meaning his mouth

23          like that he wanted to talk to him and

24          that he should come outside.

25               MS. ALTERMAN:  Okay.

Page 115

                              C. Kosmidis

     Q      Was this federal officer who was

pointing at his mouth and saying, come talk to

me, was he on the plane during the flight, or

did he come onto the plane once the plane

landed?

              MR. ROTHMAN:  Objection to the

         form.

              You can answer.

     A      I called him a federal cop, and he

said, he's not a cop, he's an agent, that was

it.  He's a federal agent.  When we landed and

when the plane stopped he is the only one that

can come on the plane before we go to Customs,

only he's allowed to do that.

     Q      Did he ever approach you where you

were seated on the plane and touch you at all?

     A      No, he just articulated.

     Q      And you're touching your mouth.

What did he do with his mouth?

     ███████████   ████████████

   ██████  ████████████████

       ███████████

     A      This is an international gesture to

show, come here, to tell you something.

Page 116

1                     C. Kosmidis

2        Q      Did you approach him after he

3    gestured to you to come here and talk to him?

4        A      I said that I was -- I'm coming.

5        Q      After you told the federal agent

6    that you were coming, what was the very next

7    thing that you did?

8        A      He turned around and left, and I

9    walked outside.

10       Q      Did you go down a ladder, or did

11   you walk in a jet bridge area, or somewhere

12   else?

13   ████  ████   ██████████

     ████

     ██████████

16       A      Nothing, I am still on the plane.

17       Q      Did you have a conversation with

18   the federal agent while you were still on the

19   plane?

20       A      I told you, no.  When he realized

21   that I understood he made the -- he turned

22   around and he walked out of the plane and I

23   followed.

24       Q      Did you follow him off the plane?

25       A      I didn't make it.

Page 117

1                           C. Kosmidis

2        Q      Why didn't you make it?

3        A      Because the moment I put -- set my

4    foot right outside the plane the whole police

5    force fell on me, like, the whole police force

6    was there.

7        Q      Did you see where the federal agent

8    went before you the saw the police officers?

9        A      He disappeared.  Until I got to the

10   door, just in five minutes he had disappeared.

11       Q      So your testimony is, you walked to

12   where you exit the plane and then all of a

13   sudden you were surrounded by police officers?

14       ███   ██████   ████████

     ██  ████

     ██       ██████████

17       A      Five meters it is from the first

18   seat to the exit.  Until I got there it was a

19   as if a whole thing fell on my head; I didn't

20   even know what hit me.

21       Q      Did anyone touch you to physically

22   remove you while you were on the airplane?

23       A      Who would do that?

24       Q      The question is, did anyone

25   physically touch you to remove you from the

Constantino Kosmidis
May 10, 2019                                          118

Page 118

1                          C. Kosmidis

2      airplane?

3           A     I told you, no, I walked by myself.

4           Q     Now, the area that connects a plane

5      to the terminal building, that enclosed

6      structure, I am going to refer to as the

7      jetway.

8                 Okay?

9           A     This accordion?

10                MS. ALTERMAN:  Yes.

11          Q     Did you walk in that accordion area

12     when you first saw the police officers?

13     ███  ████  █████████

       ███  ████████████

15          A     On my own and there was no one

16     ahead of me.

17          Q     Is that when you first saw the

18     police officers when you were in that

19     accordion area?

20     ███  ████  █████████

       ████

22          A     Yes, that's when I saw them and

23     knew what would happen to me, but I didn't

24     feel it, they fell on me.

25          Q     How many officers fell on you?



1          C. Kosmidis                                    Page 119

2          MR. ROTHMAN:  Let the record

3     reflect at some point he said boom.

4     A      Four or five, I don't remember.

5     Q      Would you be able to describe for

6     me what any of these officers looked like?



1           C. Kosmidis                    Page 120

12       A      When they fall on you, four or five

13   people, they step on you.  They hit you.  They

14   pushed my head right on the ground.  They put

15   cuffs on me behind my back.  And more than

16   that, they would hit me and call me names like

17   dirty old man, which, of course, I also

18   returned.

19       Q      Is it your testimony that these

20   officers all pushed you and hit you without

21   ever having a conversation with you first?

22       A      I did not even see them.  I just

23   fleetingly noticed them.  I was going outside

24   and they were on that accordion.

25       Q      Did you see anyone else in the

Constantino Kosmidis
May 10, 2019                                          121

```
                                                        Page 121
 1                    C. Kosmidis

 2    accordion besides for yourself and the

 3    officers at that time?

 4        A     No one.  The whole plane they

 5    stopped coming out.  I came out and there was

 6    nobody else.

 7        Q     Before the four or five police

 8    officers fell on you, did you look behind you

 9    to see if anyone was standing behind where you

10    were?

11        A     Nobody was coming behind me; the

12    plane was like dead behind me.

13        Q     How do you know nobody was coming

14    behind you, did you actually turn your head

15    and look behind you?

16        A     Am I a little kid and is it the

17    first time that I am getting on a plane with

18    security?

19        Q     You were in this accordion area

20    where everybody exits the airplane, right?

21    █████████    ████████████

██      █████

23        A     Yes, but nobody was coming behind

24    me, not my wife, nobody.

25        Q     How do you know that?
```

Constantino Kosmidis
May 10, 2019

122

C. Kosmidis

Page 122

2   A       First of all, I would have heard my

3   wife's voice after why they fell on me and

4   they were hitting me, but nobody came out of

5   the airplane.

6         Q       How long were you in the accordion

7   area with the police officers by yourselves?

8         A       Not even seconds.  They put my head

9   down and they pulled me all the way, we were

10  running out of there so nobody sees us.

11        Q       Where did they take you?

12        A       Twenty to thirty meters away from

13  the plane.  And I am yelling, telling them

14  that I am not feeling well, and all this while

15  they were hitting me.  So they got me to a

16  place where there was this -- there was a

17  barricade, and they opened it.  And they put

18  me in this room which was all cement all the

19  way up, and they started hitting me.  So it

20  was something that was not finished.  It was

21  just cement there and there was nothing else

22  there.  There were no cameras or anything.

23

24

25

Constantino Kosmidis
May 10, 2019

123



1          C. Kosmidis                    Page 123

2

3

4      Q    When you testified that the police

5   officers were hitting you in that accordion

6   area where were they hitting you on what parts

7   of your body?

8      A    My whole body, punches in the head,

9   kicks in my back, in my rear end, and in my

10  back area.

11

15     Q    How many different officers were

16  doing this to you?

17

21     A    I told you, I don't remember

22  exactly if there were four or five, but there

23  were at least four.  One of them was a

24  lieutenant I think, and the other -- the

25  others were cops.



Page 124

C. Kosmidis

Q    Was the lieutenant wearing a

different uniform than the other cops?

A    He must have.  The lieutenant has

to have his badge.

INTERPRETER:  And he describes it

as the three.

INTERPRETER:  Actually, I am doing

this for him because we are trying to

communicate.

MS. ALTERMAN:  Oh, yeah, that's

okay.

MR. ROTHMAN:  I understand.

Constantino Kosmidis
May 10, 2019

125

Page 125

1                    C. Kosmidis

2          INTERPRETER:  Yeah.

3          MR. ROTHMAN:  But you -- he's

4     testifying and you're translating but

5     only he is shown on the video.

6          INTERPRETER:  Oh, I see.  Okay.

7          MR. ROTHMAN:  So I have to speak

8     for the purposes of the video -- for

9     purposes of the written record.

10         INTERPRETER:  Yes.

11         MS. ALTERMAN:  I don't think we

12    finishes the answer, right?

13         INTERPRETER:  No.

14         MS. ALTERMAN:  Okay.

15         INTERPRETER:  He said there were at

16    least four, but there could be five.  But

17    he could tell there was one lieutenant

18    and three regular cops, and I think that

19    was it.

20    Q     And I believe you were about to

21    describe for us what the lieutenant looked

22    like.

23    A     Yeah, he was -- he had dreadlocks.

24    He had an Afro.  He was shaved in certain ways

25    how they shave their heads with certain parts

Constantino Kosmidis
May 10, 2019

126

| | |
|---|---|
| 1 | C. Kosmidis |

Page 126

2   of the head, and he was shorter than me.

3       Q    What is his race, do you know?

4       A    He was black I told you.  I don't

5   know from which island, Jamaica.

6           INTERPRETER:  He also said that he

7        was tattooed I forgot in the moment.  He

8        also had tattoos he described.

9       Q    What did any of the -- would you be

10  able to describe what any of the police

11  officers looked like?

12       A    One of them I can describe because

13  he was writing the tickets against me, and he

14  was of Hispanic origin.  And the two others I

15  think were Irish judging from their facial

16  features or structure.

17       Q    When were you placed in handcuffs

18  when you were in this accordion area or when

19  you were taken somewhere else?

20  ██ ████ ███████

     ██ ███ █████ █████

     ██ ██████

23       A    I told you outside of the

24  accordion, not inside the accordion; that's

25  where they placed them on me.

Constantino Kosmidis
May 10, 2019

127



Page 127

1           C. Kosmidis

2      Q      So while you were inside the

3   accordion your testimony is that the police

4   officers hit you and kicked you?

5   ████  █████  ████████

    ████  ██████

    ██████

    ████████████

9      A      I told you -- what I told you was

10  that it was not in the accordion area.  It was

11  right when the accordion ends and the cement

12  starts, where people walk through to get to

13  whatever area there because the police has no

14  right to come into the accordion area.  The

15  moment you step on the cement that's when that

16  happened.

17     Q      Was the cement area that you are

18  referring to inside the terminal building?

19  ████  █████  ████████

    ████

21     A      Yes, the corridor belongs to the

22  airport, to the terminal; the whole thing

23  there belongs to the terminal.

24  ████  █████  ████████  ████████

    ██████████████

Constantino Kosmidis
May 10, 2019

128



Page 128

C. Kosmidis

20    Q    So when you got off the plane you

21  walked through the accordion area before any

22  police officer touched you?

23    A    Nobody approached me from the

24  airplane to the cement area, nobody behind me.

25    Q    When you say cement area were you

Constantino Kosmidis
May 10, 2019

129

C. Kosmidis

Page 129

1

2      able to see the gate area from where you were

3      standing?

4          A      You have to walk for five hundred

5      to six hundred meters to find the gates to

6      walk downstairs.

7          Q      Were you able to see the gates from

8      where you were standing where the police were?

9          A      No.  You can't see anything, it's

10     just a corridor.  And where they took me it

11     was in that corridor area, but it was in an

12     area where people could not go to, and it

13     looked like it was not developed yet.

14         Q      Was this area where you were first

15     approached by the police officers an area

16     where all the passengers from the airplane had

17     to pass by in order to get to baggage?

18         A      Would they wait for an hour and a

19     half for all the passengers to exit so that

20     they beat me up.

21         ████████████    ████████████████

22     ████████████████    ██████████████

23     ████████████

24     █  ██████████  --

25       █████  ██████  ██████████████████

  
Page 130

1          C. Kosmidis

2    ████████      ████████████

3    Q     The area that the police officers

4    took you to was this an area where all the

5    passengers had to walk by in order to get to

6    baggage claim?

7    ███ █████████ ██████████████

8    █████

9    ██████████████████████████

10   ██████████████████████████████

11   ████████████████████ ████████████████

12   ██████████████ ████████ ██████████████████

13   ████████████

14   ███ ██████████ ████████ ████

15   ██████████████████████████████ ██████

16   ████████████████████████████████████

17   ██████████████████████████

18   ███ ████████ █████ ████████████

19   ██████████████████████████ ████████████████

20   ███ █ ██████████████████████ ████████████

21   ██████████████████████████████████

22   ██████████████████████████

23   ██████████████████████████ █████

24   ███ █████████ ████████ ████

25   ████████████████████████████████



1                    C. Kosmidis                    Page 131

2

3

4

5

6

7

8

9

10

11       Q      When the police officers first

12   touched you where were you?

13       A      Exactly on the cement.  When I put

14   my foot on it I wasn't even, I hadn't even

15   really put my foot on it.  Right at that

16   moment I was putting my foot on it, they

17   grabbed me.

18       Q      When the police officers first

19   grabbed you were you in an area where all the

20   passengers were going to pass by?

21

23       A      Yes.  That's the entrance to the

24   airport and the terminal.

25       Q      When they grabbed you, when you

Constantino Kosmidis
May 10, 2019

132

C. Kosmidis

Page 132

1

2      were standing in the entrance to the terminal

3      did the police officers touch you in any other

4      way when you were in that location?

5      ████  ████  ████████████████

       █     ███████████████

       █     █████████████

8          A     Didn't I just told you -- tell you

9      that they grabbed me, they put my head down,

10     they put the cuffs on me.  What else am I

11     suppose to say?

12         Q     Did they do that all in the same

13     location in the entrance to the terminal?

14         A     In fragments of seconds.  We were

15     running.  After that they were carrying me; I

16     was not even stepping on anything.

17         Q     Where did they carry you to?

18     ████████  ██████████████

       █     █████  ██████████████

20         A     Didn't I just tell you, they took

21     me to that area with all cement and they were

22     beating me up.

23         Q     How did you go into this area that

24     was all cement.  Was there a door that someone

25     had to open.  Was it just open to the public?

Constantino Kosmidis
May 10, 2019

133

Page 133

1                          C. Kosmidis

2      Describe for me what this area looked like?

3      ████████████    ██████████████

       █    ████

       █    ██████████

6           A       I told you three times that there

7      was -- there were wooden planks there or wood.

8      And they opened that area.  So they have put

9      the wood there as a barricade so people cannot

10     go.  And they opened that area, and they put

11     me up there.

12          Q       Who opened the area?

13          A       The officers.

14          Q       Which one?

15          A       The same officers.  If I could lift

16     my head just to see who did it, I would have

17     been happy.

18          Q       So you didn't see who did it?

19          A       How could I see it?  I had my head

20     down, and I was being beaten up.  Would I be

21     able to see who opens those woods, so they put

22     me in there.

23          Q       Well, you saw them open the wood,

24     right?

25          A       How else?  They didn't jump over

Constantino Kosmidis
May 10, 2019
134

C. Kosmidis                                    Page 134

1

2    the wood to get in.

3        Q      Did an officer have to physically

4    move wood pieces in order to bring you into

5    this area?

6        A      They're not pieces.  It's a

7    standing piece.  You lift it a little and you

8    go in.

9        Q      Your testimony is, one of the

10   officers lifted a piece of wood a little bit,

11   so that you can get into this area?

12   ████      █████      █████████████

     ██        ████

14       A      Ma'am, it was a regular piece that

15   they put in this.(In English).

16              It's those regular barricades they

17   use when there are parades.  You don't need to

18   lift it.  You just move it a little bit and

19   you go through.  They couldn't stop beating me

20   up, so somebody had to push it a little bit,

21   and I don't even know how it opened.

22       Q      They were beating you up as they

23   were carrying you?

24       A      Yes.

25       Q      And you were handcuffed at the



Page 135

C. Kosmidis

2  time?

3      A     How many times will I have to say

4  that?

5      Q     Is that a, yes, sir?

6      A     Yes.

7      Q     When did the officer who you

8  described as being Hispanic started writing

9  the ticket?

10     A     But after I was beaten up enough,

11 after they had beaten me up enough and I could

12 finally see a little around me, and I was

13 yelling that I was not feeling well and that I

14 needed water.  Then I was able to start

15 noticing who -- what everybody was like, who

16 is writing the ticket because I was lying on

17 the floor.

18         MR. ROTHMAN:  All right.  Let's

19     pause for a minute.

20         What was skipped?

21 ██████  ████████████████

22 ████████████████████████████████

23 ████████████████████████████████

24 ██████████████████████████████

25 ███████████████████████████████

Page 136

C. Kosmidis



Constantino Kosmidis
May 10, 2019                                                    137

C. Kosmidis                                          Page 137

1

2     ████████████    ████████████████████

3     ████████████████████████████████████

4              MR. ROTHMAN:  I want you to speak

5     in short pieces and give the interpreter

6     the time to translate.  Say a little, let

7     her translate and then you can continue.

8     Okay?

9              INTERPRETER:  Thank you for

10    instructing him that way.

11             And can you say that again, please.

12             (Whereupon, the requested portion

13    was read back by the reporter.)

14    A      He was writing nonstop and the

15    others were beating me up.  And then one was

16    taking a rest, and the other was continuing.

17    Q      Did the lieutenant ever touch you?

18    A      I don't want to see him again in my

19    life.

20    Q      Did he ever touch you?

21    A      He was the one who was hitting me

22    the most and calling me names that would have

23    made me normally jump off the building and

24    commit suicide.  He was not a human being.

25    █   ██████████████████████

Page 138

1          C. Kosmidis



9          INTERPRETER:  And he said after

10    that he was an animal.  And that I

11    omitted that; I didn't say that he said

12    that he was an animal.

13         A    He was worse than an animal.  Not

14    an animal, worse than an animal.

15         Q    So it's your testimony that the

16    lieutenant was acting worse than an animal,

17    correct?

18         A    Exactly.

19         Q    What names was he calling you?

20         A    Goddamnit old guy with badder words

21    for the street, not for me, without see that I

22    am forty years older than him and have

23    respect.  I'm American citizen.  I didn't do

24    nothing.  They don't -- (In English).

25              The officers of the law don't

Constantino Kosmidis
May 10, 2019

139

Page 139

C. Kosmidis

1

2       behave that way.

3              INTERPRETER:  The rest was in

4       English.

5              MR. ROTHMAN:  Okay. Dino, if you

6       remember in English what the guy said to

7       you in English, you can tell us that in

8       English, otherwise continue to testify in

9       Greek.

10             Do you understand?  Yes?

11             THE WITNESS:  Okay.

12             IOANIS:  He's not getting it.

13

14

15

16

17

18

19

20

21

22

23

24

25

Constantino Kosmidis
May 10, 2019

140

C. Kosmidis

Page 140



9   Q    What else did the lieutenant say to

10  you besides for goddamnit?

11      A    Curse words that I cannot repeat in

12  front of women.

13          MR. ROTHMAN:  Don't worry about our

14      emotions or sensitivity or gender.  You

15      say what you remember.  Don't worry about

16      it, they can handle it.

17      A    I born in different country (In

18  English).

19          MR. ROTHMAN:  Do you want him to

20      say it?  And if you want him to say it

21      he'll say it.

22      Q    Besides for curse words, did he say

23  anything else to you?

24      A    What else would he say?  What else

25  would he say?  They beat up and called me

Constantino Kosmidis
May 10, 2019                                    141

Page 141

1                    C. Kosmidis

2    course words; words that if I were young and

3    strong they would make me eat the cement.

4        Q      Besides for the lieutenant, was any

5    other officer cursing at you?

6        A      He was cursing because he was the

7    big shot as they say, and the others were

8    kicking because they were nothing special.

9    Okay, because my attorney advised me to say --

10   instruct me to say what I feel, I'm going to

11   say what I feel.  Can I say it now?

12       Q      Yes.

13       A      I'm sorry, but it's going to come

14   my mind that I bother you again for a second;

15   I forgot what I was going to say.

16            MS. ALTERMAN:  Okay.  If you

17       remember you could let me know.

18            THE WITNESS:  Yes.

19       Q      What was the Hispanic officer

20   writing you a ticket for?

21       A      Up until today I don't know even

22   know why they beat me up or what they were

23   writing about and what they were writing.

24       Q      How do you know he was writing you

25   a ticket then?

Constantino Kosmidis
May 10, 2019

142

Page 142

C. Kosmidis

1

2      A      I can explain to you for which

3  reason.  When they stopped beating me up and

4  the two officers from TSA came asking me if I

5  need water or anything like that, so while

6  they were beating me up this young guys came,

7  they were wearing a uniform, and they just

8  came to help me.

9      Q      Are these the TSA officers?

10         INTERPRETER:  He didn't answer

11      exactly the question, but, he said they

12      came when they heard me shouting and

13      screaming.

14      A      And they came to look at my

15  condition.  And they said, look at him, bring

16  him some water and take care of him.

17      Q      Who brought you the water the TSA

18  officers or different officers?

19      A      So one of the two lieutenants of

20  TSA they came over and brought me a big bottle

21  of water.  And he asked me if I needed more

22  water because I was begging them not to hit me

23  on my head or in my -- because I am diabetic,

24  but he was stepping on me.  So and after they

25  brought me the water.  And I drank a lot of it

Constantino Kosmidis
May 10, 2019                                           143

Page 143

                              C. Kosmidis

1       and a lot of it I poured over myself because

2       they were hitting me, and they were stepping

3       on me with their boots, with their army boots

4       what else?  I have nothing else to say.

5                   INTERPRETER:  I asked him to

6              continue because it seemed like I had

7              interrupted him so I can capture that.

8                   THE WITNESS:  I remember now the

9              question that I have to tell you (In

10             English).

11                  MS. ALTERMAN:  Okay.

12                  THE WITNESS:  So when the whole

13             procedure ended of actually them beating

14             me up, and they knew how to hit me so

15             they don't cause bruises, they were

16             hitting me on the sides, they were

17             hitting me on my genitals, and I have

18             problems there.

19                  Should I say it in Greek or should

20             I say in English what I haven't told you?

21                  MR. ROTHMAN:  Continue in Greek.

22         A      In the end of this performance, so

23      after this torture somebody called the

24      sergeant (In Greek).  On his phone.  He left

Constantino Kosmidis
May 10, 2019                                            144

|                                                              | Page 144 |
|---|---|

1                  C. Kosmidis

2    the company now we are in easy.  Nobody beat

3    me.  They make me go sit down and put my back.

4    I said, get me to the bathroom or something.

5    Nothing.  So I said, I am going to do it over

6    here.  I'm ten hours of flight and two hours

7    you hit me, I am not young anymore (In

8    English).

9                 MR. ROTHMAN:  Testify in Greek.

10        A     And he went up to the -- (In

11   English).

12                MR. ROTHMAN:  No, no, testify in

13            Greek, Dino, testify in Greek.  We have a

14            Greek interpreter.

15                WITNESS:  Okay.

16                MR. ROTHMAN:  In Greek.

17        A     So and when they called him on the

18   phone and I was left there with the other

19   officers and the two people from TSA, he left

20   and he went up the stairs to some area where

21   there was nothing there.  So he went up there

22   at the end of the second floor to an

23   undeveloped area where there was just cement,

24   and there was nothing there.  There was no

25   security and there were no cameras, nothing.

Constantino Kosmidis
May 10, 2019                                    145

Page 145

1                        C. Kosmidis

2    That's where he went.

3        Q    Who went?

4        A    The lieutenant.

5             MR. ROTHMAN:  I believe that the

6        translator is using the terms lieutenant

7        and sergeant interchangeably.

8             INTERPRETER:  I was not sure if --

9        no, I didn't actually.  I wasn't sure if

10       it was the same person or if it was two

11       different people, that there was a

12       lieutenant and there was a sergeant.

13            MR. ROTHMAN:  I believe you're

14       referring to the same person is the

15       understanding of the client's son who's

16       sitting beside who's listening to the

17       Greek translation.

18            INTERPRETER:  Yeah, I translated it

19       as lieutenant and he said sergeant.

20       Q    All right.  Would you be able to

21   just clarify:  Before the testimony as it was

22   translated was that you were referring to then

23   a sergeant.

24            Was there a sergeant involved in

25   this, or was it only the lieutenant?

Page 146

C. Kosmidis



```
 1
 2  ████  █████  █████  █████  ▌  ████
 3  ██████████████████████████████
 4  ██████████████████████████████████
 5  ██████████████████████████
 6  ████████████████████████████
 7  ██████████████████████████████  █████
 8  ████████████████████████████
 9  █████  ███████████████████
10  █████  ██████  █████  █████  █████
11  ██████████████████████████
12  ████████████████████████████████
13  ████████  ██████████████████████
14  ███  ████████  █████  ████████████
15  ████████████  ▌
16  █████  ███████████████  █████████
17  ██████████████████████████████████
18  █████  ██████  █████  █████  ███████
19  ███  █▌  ████████████
20  █████  ██████  █████  ████████████
21  ██████████████  ████████████
```

22       Q     Before you testified that there was

23  a sergeant involved.  Was there a sergeant

24  involved, or was it just the lieutenant who

25  you had described earlier?

Constantino Kosmidis
May 10, 2019                                          147

Page 147

1                    C. Kosmidis

2    ███      ██████  ████████  ███████████████

3         ███████

4         A     Yes, the sergeant has three or four

5    people, soldiers with him; that's all.

6         Q     Earlier we were calling the

7    sergeant a lieutenant.  Are we talking about

8    the same person, the person who you described

9    with dreadlocks?

10        A     No, it was just one that person

11   with the dreadlocks, the others were plain.

12        Q     What color was that person's shirt?

13        A     Regular uniform, police uniform.

14   Nothing else.  No special names.  No bronze.

15   No nothing (In English).

16             MR. ROTHMAN:  Greek.  Testify in

17        Greek.  Did you say the word bronze or

18        brand?

19        A     I didn't look for the names (In

20   English).

21             MR. ROTHMAN:  In Greek.

22             MR. FARAGOS:  I thought he said

23        brand as in branding as in the

24        designation.

25             INTERPRETER:  Yeah, that's what I

Constantino Kosmidis
May 10, 2019

148

C. Kosmidis

Page 148

2    thought but he said bronze.

11         INTERPRETER:  Do you want me to

12    translate if he said bronze or brand?

13         MR. ROTHMAN:  Sure.

14    A      It was plain police uniform unless

15    they had some badge that they were also from

16    the airport; that I do not know.

17    Q      What color was the uniform?

18    A      Regular police officers, and

19    regular police like every place in New York

20    City.  Blue color, what is that?

21         Johnny, I'm sorry, I'm not here (In

22    English).

23         MR. ROTHMAN:  Dino, we know you

24    understand a considerable amount of

25    English, but because we have the Greek

Constantino Kosmidis
May 10, 2019                                    149

1                      C. Kosmidis

2          interpreter testify in Greek.  Sometimes

3          you switch to English.  Don't switch to

4          English.  Testify in Greek.

5                  WITNESS:  You are damn right (In

6          English).

7                  MR. ROTHMAN:  Good.  And if you

8          need to take a break, we will take a

9          break.  No problem.  Okay?

10                 WITNESS:  Thank you (In English).

11    BY MR. ROTHMAN:  Okay.

12        Q     You testified that when the TSA

13    officers came and brought you water that

14    someone was still stepping on you.

15                 Who was stepping on you at that

16    moment?

17    ████  ████████  ███████████████

      ████████

      ████████████████

20        A     The other three cops and the

21    sergeant.

22        Q     So when the TSA officers came to

23    give you water all three officers and the

24    sergeant were stepping on you at that time?

25        A     I told you that there were two

Constantino Kosmidis
May 10, 2019                                    150

Page 150

1                    C. Kosmidis

2    people from TSA.  One of them went to get me

3    water.  And the other one was there.  The

4    moment that guy was there the other people

5    stopped hitting me while he was present.

6         Q     Did any of the officers step on you

7    or hit you in the presence of the TSA

8    officers?

9         A     I got the whole beating happened

10   right before those guys came because I was

11   yelling, I was yelling out, get an ambulance

12   beating, police.

13        Q     When the TSA officers came were you

14   seated, were you standing, what position were

15   you in when they first approached you?

16        A     I was lying on the ground, and I

17   was putting my body back so I can take a

18   breath because I was -- and I was on the

19   cement.  And that's when the phone rang.  The

20   beating was over by that moment.

21             MR. ROTHMAN:  Excuse me.  I think

22        at some point according to the

23        plaintiff's son he was sitting at some

24        point with his back against the wall, I

25        think maybe that's when he said he said

1                    C. Kosmidis

2           he took to take a breath, but otherwise

3           he said he was laying on the ground.

4                INTERPRETER:  Yeah.

5           Q     Were you bleeding from any part of

6    your body?

7           A     My whole head was full of blood.

8           Q     Where was the blood?

9           A     Dripping down my ears.  I was

10   beaten up.

11          Q     You testified before that the

12   officers knew how to hit you so that you

13   wouldn't bruise anywhere.

14               MR. ROTHMAN:  Hold on.  If there's

15          a question, go ahead and ask the

16          question.

17          Q     Did you have any bruises on any

18   part of your body?

19          A     In the condition I was in you were

20   expecting me to lift my clothes to check if I

21   have bruises so I can take them to court, come

22   on.

23          ████        ████████████████████

24   ████████

25          ██████████      ████████████

Page 152

1                        C. Kosmidis

2          ███████████

3          Q      Were you bleeding from any part of

4    your body besides for your face?

5          A      I don't give a damn.  I didn't

6    know, I am not a doctor.  I just said that

7    they punched me with those boots on my head

8    down to the cement.  Where the blood came, you

9    asked me a question I cannot answer (In

10   English).

11            MR. ROTHMAN:  Dino, again, you're

12        slipping into English but we have the

13        interpreter here, so we need to continue

14        on in Greek.  If you need a break -- you

15        want to take a break?  You need a break

16        or no?  No?  Okay.

17            WITNESS:  Give me one second (In

18        English).

19            MR. ROTHMAN:  Take your time. take

20        a deep breath and then we'll continue.

21            THE WITNESS:  I am sorry it is not

22        your fault, but think how I felt (spoken

23        to the interpreter in English).

24            MR. ROTHMAN:  Are you ready?

25            WITNESS:  You want me to continue

Constantino Kosmidis
May 10, 2019                                          153

                                                          Page 153

1                    C. Kosmidis

2        about the call that the sergeant (In

3        English)?

4              MS. ALTERMAN:  In a moment.  Are

5        you ready to continue?

6              THE WITNESS:  Yes.

7        Q      You testified that someone hit you

8    in the genitals.

9              Who did that?

10       A      One of them.

11       Q      Did they kick you in that area, did

12   they punch you, what happened?

13       A      I was lying on the ground, so where

14   would it go?  It would go -- it wouldn't just

15   go to my ribs.  It would go to my back.  It

16   would go to my butt.  It would go to my front

17   area.

18       Q      Were you kicked in the genital

19   area, or something else?

20       A      Yes.

21       Q      How long did the police officer

22   have you in this area where you're testifying

23   that they were kicking you and hitting you

24   before the TSA officers approached you?

25   ███  ████    ██████████

Constantino Kosmidis
May 10, 2019                                          154

                                                            Page 154
1                    C. Kosmidis

2         ███

3              ███████████

4         A     I have no idea, hours, ten minutes,

5    one hour, enough time.

6         Q     So you have no idea whether or not

7    this happened over a course of a few minutes

8    or a few hours?

9         A     The only thing I can tell you is

10   that the airplane had been completely empty,

11   had been emptied, and all the people had left

12   there.  That's when they took me to that other

13   area after the beating finished.

14        Q     Were you able to see the passengers

15   exit the plane from the area where you claim

16   they beat you up?

17        A     When TSA took me to find my wife in

18   the Customs area there was nobody left there.

19   Everybody was gone.

20        Q     Were you able to see the passengers

21   come off of the airplane from where you were

22   with the police officers?

23        A     I told you when you're lying on the

24   ground on the cement you cannot see anything,

25   there is a height.  I was yelling only, help

Page 155

1               C. Kosmidis

2   police.

3        Q     You testified that the sergeant

4   made a phone call?

5   ███ ████  ███████████

    ████

    █████████

8        A     Yes.

9        Q     Were you able to hear what the

10  sergeant was saying when he was on the phone?

11       A     He was two hundred meters away up

12  on the second floor.

13       Q     But you could see where he was on

14  the phone, talking on the phone?

15       A     The phone rang there and then he

16  said, wait here, and he went up there to talk.

17       Q     Did he come back down to the area

18  where you were you were after he had this

19  telephone call?

20       A     Yes, and very ironic old man piece

21  of shit, you are lucky I changed my mind, tear

22  the tickets.  I said, don't do that (In

23  English).  Yeah, the sergeant said to the guy

24  who was writing the tickets, tear everything

25  down and let that shitty old man go home.

Constantino Kosmidis
May 10, 2019                                         156

                                                    Page 156
1              C. Kosmidis

2         Q     Did the officer tear up the ticket?

3         A     They tore it up right there.   From

4    all those the notes -- the blocks they have

5    right here, indicating inside their belt, he

6    took them out and tore them up.

7         Q     Were you sitting up while the

8    officer tore up the ticket?

9         A     No, I was lying down, and I was

10   looking at them.   And I told him, don't tear

11   them up, I am going to need them.

12        Q     Were the TSA officers present when

13   the tickets were torn up?

14        A     No.

15        Q     Where did they go?

16        A     Somewhere around there.   They had

17   also checked on the people that were leaving.

18   He was not that stupid to do that in front of

19   other officers.

20        Q     Did the TSA officers return at some

21   point to take you through Customs?

22        A     Yes, TSA took me, they left.   So

23   they took me to where my wife was who was

24   crying.   They gave me back my passport, which

25   had disappeared, and then they made me fill

Page 157

                        C. Kosmidis

1

2    out that form that says that I didn't bring

3    anything in the country illegally.

4        Q    Who took your passport?

5        A    The police had taken it.  They took

6    it out of my pocket, but then they thought

7    about it and they left it at this area where

8    you pass by to do the duty; that's where they

9    kept them there.

10       Q    So it's your testimony that the

11   police officers took your passport out of your

12   pocket and then put it somewhere else in a

13   Customs area and left it for you there?

14   ████  ███████  ███████████████

██         ███████

16       A    Yeah, these people from TSA they

17   took the passports -- no.  So when I was lying

18   down, my passport was taken out of my pocket

19   by the sergeant.  So where he took it

20   afterwards I am guessing that he took it to

21   one of the TSA people and then they gave it

22   back to me.

23       Q    Are you guessing or do you know --

24   you don't know, right?

25   ████  ███████  ██████████████

Page 158

1                 C. Kosmidis

2      ███████  ██████████████████

3      A     I thank the God I am alive and I'm

4  talking to you again (In English).

5           MR. ROTHMAN:  In Greek, Greek.

6      Q     Did you ask any of the police

7  officers if you could smoke a cigarette while

8  this was happening?

9           MR. ROTHMAN:  Objection to the

10     form.

11     A     I asked them the first thing I want

12 is water, the toilet, and a cigarette.

13           Then I was needed badly (In

14 English).

15           MS. ALTERMAN:  Okay.

16     Q     What did they say when you asked

17 for those things?

18     A     Nothing.  They said nothing.  They

19 just said bye ironically, and I said, I'll see

20 you again.

21      ████████  █████████████████████

22 ████████  ██████████████████████

23     ██████████████  █████████████████████

24 █████████████████████████████████████

25 █████████████████████  █████████████████

Constantino Kosmidis
May 10, 2019                                    159



Page 159

1                    C. Kosmidis

19     Q      Did any of the police officers ask

20   you if they -- you wanted to go to the

21   hospital or wanted an ambulance to come?

22        A      Thank you.  You make me laughing.

23   The people that did this (In English).

24           So the cop who is beating you up is

25   going to ask you if do you want me to take you

Constantino Kosmidis
May 10, 2019                                        160

Page 160

1                    C. Kosmidis

2     to the hospital.

3          Q     So it's your testimony that they

4     never asked you if you needed an ambulance

5     called or wanted to go to the hospital,

6     correct?

7          A     Yes, sure, sure.  We said worse

8     than animal.

9     ████ █████████    █████████████████

10    ██████

11         ██████████    █████████████████

12    ████████████████████████

13              MR. ROTHMAN:  Dino, listen to the

14         question.  Listen, just listen to the

15         question and then answer the question.

16         Okay?

17              WITNESS:  I am answering the

18         question she makes me.  I said like an

19         animal they never ask you to send you to

20         the hospital.  They ask you?  That's what

21         I said (In English).

22              MR. ROTHMAN:  Okay.  Keep doing the

23         best you can.  Thank you.

24         Q     When you were escorted by the TSA

25    officers to meet your wife how did you get

Constantino Kosmidis
May 10, 2019                                      161

Page 161

1            C. Kosmidis

2   there, did they need to assist you to walk to

3   meet her, did you walk on your own, what

4   happened?

5        A     So it's not their job to take me to

6   the hospital, to take one to the hospital.

7   They just asked me what I needed, water,

8   toilet.  They took me to my wife and she was

9   barely standing.

10       Q     Okay.  I don't think you understood

11   the question that I asked.  So the question

12   was, how did the TSA officers escort you to

13   meet your wife, did they have to help you to

14   walk, or did you walk on your own, or

15   something else?

16       A     They were supporting me.  I was in

17   the middle and they were holding me from the

18   sides, and they were like hold it, go slow.

19   ████████████  ████  ██████  ██████

20   █████████████████████  ████

21   ███████████████████████

22   ████████████████████████

23   ███████████████████████

24   ████████████████████████

25   ████████████████████████

Constantino Kosmidis
May 10, 2019                                                    162

Page 162

C. Kosmidis



Constantino Kosmidis
May 10, 2019                                              163



Page 163

1                    C. Kosmidis

11       Q    Do you have any complaints about

12   the treatment that you received from the TSA

13   officers?

14       A    I appreciate the gentleman, they

15   were gentleman both of them (In English).

16       Q    Would you be able to describe what

17   they looked like besides for being male?

18       A    Two tall guys, very polite faces.

19            Smiling people the officers(In

20   English).

21            That's how I would like to see all

22   the policemen in New York polite like these

23   two boys.

24       Q    When you met up with your wife was

25   that in the Customs area, or somewhere else?

Constantino Kosmidis
May 10, 2019                                    164

Page 164

                    C. Kosmidis

1

2       A       She was in the Customs area.  They

3   had thrown apparently her stuff around, and

4   they were trying to help her collect her

5   stuff.

6               INTERPRETER:  And his son had

7           called a friend of his to come and pick

8           them up.

9       Q       Who threw your wife's stuff around?

10      A       You're asking me?

11      Q       You don't know?

12      A       To see if we have something (In

13  English).

14  ████████████     █████████████

    ████████████████████████████

    ████████████████████████████████

    ████████████████████     ████████

    ██████████████████     ██████████████

    ████████████████

20      Q       When you say that they threw your

21  wife's bags around was that in the process of

22  going through Customs, was that done by the

23  Customs officers, or some other agents?

24              INTERPRETER:  He answered a

25          different question.

Constantino Kosmidis
May 10, 2019                                     165

Page 165

C. Kosmidis

1

2          MS. ALTERMAN:  I guess just

3      translate what he answered and then I'll

4      ask him this.

5          A     No Customs officers no nothing (In

6  English).

7              INTERPRETER:  He said that TSA did

8      everything.  They brought him his

9      passport and the custom forms and he

10      signed that paper.

11          Q     So my question to you, sir, is not

12  about the TSA officers.

13              You just testified that when you

14  met your wife her bags were all thrown around.

15  I want to know why were they thrown around,

16  what was happening at that time?

17

18

19

20          A     Maybe as she was passing there --

21  through there with the rest of the people they

22  probably said, oh, this is the criminal's

23  wife, and they search her stuff more

24  thoroughly.

25          Q     Did your wife ever tell you that

Constantino Kosmidis
May 10, 2019

166

Page 166

1           C. Kosmidis

2    her belongings were searched by any officer?

3        A    She didn't talk to me for a year

4    (In English).

5            She didn't talk to me for a year

6    because she would look at me and just cry.

7        Q    When she first saw you when you

8    were brought to her by the TSA officers what

9    did you say to her?

10           INTERPRETER:  The question was what

11      he told her or what she told him?

12           MS. ALTERMAN:  What he told her.

13       A    I didn't say anything with my wife.

14   I didn't discuss anything.  I just asked her

15   if she called my son.

16   ■    ████████████████

     ██  ████████████████

18           ██  ████  ████  ████

19       ████████████████

20       ████████████  ████████

21       ████████████

22       ████████████████

23       ████

24       Q    Did you ever tell your wife in the

25   presence of other people about what the police

Constantino Kosmidis
May 10, 2019                                              167

Page 167

1                    C. Kosmidis

2    officers did to you?

3        A    I never mentioned to anyone what

4    happened at that period of my life especially

5    that particular day.  I've been trying to

6    forget about it for two years.

7        Q    Did you ever talk to your son who's

8    present here today about what the police

9    officers did to you?

10       A    He was at the hospital with me, and

11   he would see me.  And he was asking, is this

12   really my father.  Why don't you ask him?

13       Q    My question is, did you ever tell

14   your son what the police officers did to you

15   in the airport that day?

16       A    That they beat me up I told him

17   later.

18       Q    When did you tell him?

19       A    Not then now, I told him.

20       Q    When was the first time you had a

21   conversation with your son about what had

22   happened to you?

23       A    It's not -- when I say it is now, I

24   don't mean now at this moment that I was

25   beaten up.  I don't remember.  Greek is

Page 168

1                           C. Kosmidis

2    different than English.

3    ████████████  ██████████  ██████████

4    ████████

5              ████████████  ██████████████████

6    ██████████████████████████

7         Q    Do you recall the first time you

8    had a conversation with your son about what

9    had occurred?

10   ████████████  ██████████████████

     ████████

     ████████████

13        A    I don't remember when it was (In

14   English).

15   ████  ████████  ████████████████

16        A    I don't remember when I told him, a

17   month later, two months later, six months

18   later, I don't remember.

19        Q    Did your son's friend pick you up

20   from the airport?

21        A    We've known him since -- for many

22   years now, and he's also a driver.  And my son

23   called and he came and picked us up because he

24   was not in New York.

25        Q    What is the name of the person who

Constantino Kosmidis
May 10, 2019                                    169

Page 169

C. Kosmidis

1

2    picked you up from the airport?

3        A    Teddy.  He is the son of a friend

4    of mine who is also -- and a relative of mine

5    from Greece.

6        Q    Where did Teddy take you from the

7    airport?

8        A    Home.

9        Q    What did you do when you got home?

10       A    I don't know what the others did.

11   I know I didn't do anything.  I know that the

12   ambulance came and took me to the hospital.

13       Q    How long were you at your house

14   before the ambulance came and took you to the

15   hospital?

16       ████ ██████    ███████████████

17   ██████  █████████████████████

18   ████████████████████  ██████████████

19   █████████████████████████

20   ████████ █ ██████████████████    ████

21   ████████████████████████

22   ██████████  █████████████  █████████████

23   ██████████████████

24            MS. ALTERMAN:  Is that correct?

25            INTERPRETER:  That his son told

Page 170



1                    C. Kosmidis

2        him, yeah.  At this moment I did not say

3        that because also I know that I had just

4        said it.  And my mind said, you know,

5        that's been said already, and it's no big

6        deal.



Page 171

1                C. Kosmidis

2

3    break.

17    Q    Did you have any conversations with

18    your son while you were at your house before

19    the ambulance arrived?

20

21

22

23    A    You mean him, indicating -- showing

24    Ioanis.

25    Q    Yes.

Page 172

1                    C. Kosmidis

2        A     My wife talked.  I could not talk,

3    I couldn't do anything.

4        Q     Who called the ambulance to your

5    house, if you know?

6        A     My son spoke to the driver, now,

7    I'm finding out about it.  So my wife talked

8    to Teddy.  My wife called Ioanis, John.  John

9    was not in New York, and he sent Teddy to pick

10   us up.

11       Q     And how did the ambulance get to

12   your house?  Who called the ambulance or who

13   called 911, or who arranged for the ambulance

14   to take you to the hospital?

15   ▮▮ ▮▮▮ ▮▮▮▮▮

     ▮▮▮

     ▮▮▮▮▮

18       A     You should ask my wife.  I don't

19   know because I was out.

20       Q     Were you unconscious, were you

21   sleeping, what condition were you in?

22   ▮▮ ▮▮▮ ▮▮▮▮▮

23   ▮▮

24       A     No, I was in another world.  I was

25   not feeling -- while I was in the car I was

```
 1                    C. Kosmidis

 2     trembling all over.  I was not in a condition

 3     to call.

 4          Q     Did you take any medication when

 5     you were at your house before the ambulance

 6     picked you up?

 7          A     I didn't take any drugs that -- on

 8     that day -- any medications.  I had taken my

 9     medications in the morning in Greece and on

10     the road as we were going to the plane.  I

11     didn't take any other drugs.

12          Q     Did either of your sons meet you at

13     the hospital?

14          A     My younger son.

15          Q     Who is here today?

16          A     Yes, him over there (indicating).

17          Q     Did you receive any treatment in

18     the ambulance while you were being transported

19     to the hospital?

20          A     I don't remember anything.  What I

21     remember is that they put me on the bed in the

22     hospital.  I don't remember getting there.

23          ███ ████  █████  ████

24     ████████████████████████████

25     ███████████  ████████
```



Constantino Kosmidis
May 10, 2019                                         174

Page 174

1              C. Kosmidis

2

3

4

5

6

7

10    Q      What hospital were you taken to?

11    A      North Shore.

12    Q      What were your complaints of pain

13   when you arrived at the hospital?

14    A      Everything was hurting me.  First

15   of all, I wasn't understanding Ioanis was

16   telling me where are you hurting and I would

17   say everywhere on my whole body.

18    Q      What did you tell your son about

19   what had happened in the airport?

20

23    A      I told you that they were treating

24   me, and I was going through tests.  I couldn't

25   talk to my son about anything.

Constantino Kosmidis
May 10, 2019                                          175

Page 175

1                    C. Kosmidis

2       Q      Did your wife have a conversation

3   with your son while you were in the hospital?

4       A      I told you that evening and for the

5   next two days and Saturday morning I couldn't

6   talk or do anything.  I was in  --

7       Q      What type of test did they do in

8   the hospital.



Constantino Kosmidis
May 10, 2019

176

Page 176

C. Kosmidis



11    Q    Did you have any tests done while

12  you were in the hospital?

13    A    All tests that exist.

14    Q    Did any of the doctors tell you the

15  results of the tests?

16    A    I didn't ask anyone, and when I

17  left my son took me home I didn't want to hear

18  anything.

19    Q    Did you leave the hospital the same

20  day you went to the hospital?

21    A    Since I could not communicate

22  because I was not feeling well, I didn't have

23  any conversation, I don't know my son.

24    Q    Did you sleep over in the hospital,

25  or did you leave the same day that you came?

Constantino Kosmidis
May 10, 2019                                                    177

Page 177

1                       C. Kosmidis

2        A      I stayed all night and they let me

3   leave the next day.  The whole time they had

4   me doing test and IV.

5        Q      Were you given any instructions by

6   the hospital before you left the next day?

7        A      I don't know.  I don't know, my

8   wife knows.

9        Q      When was the next time that you saw

10  a doctor after you went home from the

11  hospital?

12       A      After I was home, I went to all the

13  doctors.  I went to my doctor, and he told me

14  you have to go to this doctor and to that

15  doctor and have this test done because I was

16  very worried.

17       Q      Which was the first doctor that you

18  went to after you got home from the hospital;

19  do you remember the first doctor you went to?

20       A      My main doctor.

21       Q      Who's that?

22       A      Can I think?

23       Q      Yes.

24       A      Dr. Jim Hilepo, he's my main doctor

25  (In English).

Page 178

1                          C. Kosmidis

2          Q      What were your complaints when you

3     saw Dr. Hilepo?

4          A      He told me how can you be in such

5     bad shape because I still had the bruises.

6          Q      At that point, were you able to see

7     where on your body you were bruised?

8          A      He examined me everywhere.  He had

9     me take my clothes off, and he examined me

10    down here, he examined me in the back.

11         Q      Where were you bruised?

12         A      I don't know, and I didn't ask him.

13         Q      Do you remember anyone taking

14    pictures of you while you were in the

15    hospital?

16         A      Maybe they took pictures, I don't

17    know.  I tell you I was in a terrible shape,

18    and you are telling me if I remember anyone

19    taking pictures of me.

20         Q      Did anyone ever show you pictures

21    and say these were pictures taken of you while

22    you were in the hospital?

23    ███  ██████  ████████████

24       █████

25        ████████  ██████  ████████████

Constantino Kosmidis
May 10, 2019                                    179

C. Kosmidis



Constantino Kosmidis
May 10, 2019                                              180



Page 180

1                    C. Kosmidis

2

3

4

5

6

7        A    And I am telling you I don't know

8   and I don't remember if anyone took a picture

9   of me.

10       Q    Have you ever seen any pictures of

11  you in a hospital bed?

12       A    No.  On the hospital bed, no.

13       Q    Did you ever see any pictures of

14  any of the injuries that you are claiming as a

15  result of this incident?

16

17

18

19       A    Break down the question.

20       Q    Did you ever see a photograph

21  showing any of the injuries that you claim

22  occurred as a result of the police?

23

24

25       A    You think I would remember whatever

Page 181

1                     C. Kosmidis

2     was to be shown in pictures.  I am trying to

3     forget what happened to me, so no more

4     questions about this, please.

5          Q     Did you ever come to learn that

6     either of your sons called the police on your

7     behalf?

8          A     I can't hear you that you're

9     sitting right next to me, I am going to hear

10    people who are talking from far away.

11                MS. ALTERMAN:  Read back.

12                (Whereupon, the requested portion

13         was read back by the reporter.)

14         A     I told you, you can ask my wife if

15    she knows anything about that because as I

16    told you I have difficulty hearing and I

17    cannot hear even you who are sitting next to

18    me.

19         Q     Did either of your sons ever tell

20    you that they called the police about what had

21    happened to you?

22         A     I don't understand what you're

23    saying.

24         Q     Did your son Ioanis, who is here

25    today, did he ever tell you that he called the

Constantino Kosmidis
May 10, 2019                                           182

Page 182

1                    C. Kosmidis

2    Port Authority police?

3        A    No.  Never did he tell me such a

4    thing, or he said it and I didn't hear it.

5    It's the same thing, or he said it to me and I

6    didn't hear it.

7        Q    Do you remember Dr. Hilepo

8    referring you to a doctor by the name of Dr.

9    Blanck?

10       A    I think he was a psychologist or

11   something.

12       Q    Did he do tests on you?

13       A    Yes, he asked me questions, he did

14   tests, yes.

15       Q    Did he give you any instructions

16   about what you should do?

17       A    Yes, and I refused them.

18       Q    What did he tell you to do, or what

19   did he recommend?

20       A    To give you tranquilizers so you

21   stop having these things -- seeing these

22   things in your sleep.

23   ███  █████    ████████████

24   ██████

25        ██████████    ████████

Constantino Kosmidis
May 10, 2019                                    183

1                     C. Kosmidis

6       A      We're talking about the same

7  doctor, the psychiatrist?

8       Q      Yes.

9       A      When?

10      Q      Okay.  What else did he recommend

11 for you?

12      A      He told me -- well, I told him that

13 I'm not taking tranquilizers.  I am a normal

14 person that I am going to fight it on my own,

15 and I'm going to forget it.  And I did forget

16 it, and right now you are reminding me of it

17 again.

18      Q      Did Dr. Blanck or Dr. Hilepo ever

19 tell you that you should stop driving?

20      A      No.  I stopped because I get dizzy,

21 and up until actually today they don't know

22 why I get dizzy; they have not seen why I get

23 dizzy.

24      Q      When you get dizzy what happens,

25 what do you feel?

Constantino Kosmidis
May 10, 2019                                    184

Page 184

1                    C. Kosmidis

2        A      I will give you an example.  I walk

3  outside to take a walking around my

4  neighborhood and suddenly I lose my balance

5  and I have to stop to sit down until the

6  vertigo goes away.

7        Q      Did you ever have this vertigo or

8  these dizzy spells before September 15, 2017?

9        A      I didn't have anything.  When I

10 went to Greece I ran, I swam, and I even

11 cried; I did everything.

12       Q      Are you claiming that you have

13 these dizzy spells as a result of what the

14 police did to you?

15  ███ ████ ███████

██  ████ ██████ ███████

██  █████████████████

██  ██████████████████

██  █████████████████

██  ██████████

21       A      I don't know, if I knew I would act

22 differently.

23  ███ ████ ██████████

24  █████ ████████████

25  ████████████████

Page 185

1                          C. Kosmidis

2          Q      Did any doctor tell you that you're

3     suffering from either dementia or early stages

4     of Alzheimers?

5          A      I don't remember anything like

6     that.

7          Q      Did any doctor recommend that you

8     be prescribed antidepressant medication?

9          A      Even if he did or if he didn't,

10    it's the same thing, I'm not taking them.

11         Q      And I'm assuming based on your

12    testimony you have never sought guidance from

13    psychologist or a psychiatrist as a result of

14    this incident?

15    ███   ██████   █████████████

██    █████

██    ████████████

18         A      I don't remember.

19         Q      Do you recall falling down your

20    basement steps sometime in 2018?

21         A      Yes, I slipped and fell.

22         Q      How many stairs did you fall down?

23         A      I said I slipped.  I didn't say I

24    fell.  I fell on my butt.  Nothing is

25    bothering me.

Constantino Kosmidis
May 10, 2019

186

Page 186

1                        C. Kosmidis

2        Q       How many stairs did you slip down?

3        ████  ██████  ████████████

4    ██████

5        ████████████████

6        A       Five, six wooden steps.

7        Q       Did you hurt any part of your body

8    as a result of slipping on the steps?

9        A       I didn't fall head forward.  I fell

10   on my butt.  I use to be a soccer player, I

11   was trained, I fell on my butt.

12       Q       Did you hurt any part of your body

13   as a result of falling on your butt?

14       A       I never had a problem (In English).

15   Of course, I hit my body.  Of course, I hit my

16   body if I slipped, but it's not pain that I

17   cannot handle.  It was for one month or a

18   month-and-a-half.

19       Q       Did you ever go to a doctor about

20   the pain?

21       A       Of course, I went to the doctor,

22   and he checked to see if I broke any bones.

23   And there was nothing like that.  And he said,

24   well, you'll be hurting for a few weeks.

25       Q       Who did you go to, which doctor?

Constantino Kosmidis
May 10, 2019                                    187

Page 187

1                        C. Kosmidis

2        A      Now, this was two or three years

3    later, how can I remember.   I probably went to

4    my doctor.

5        Q      Dr. Hilepo?

6        A      Yes, my doctor then at the time was

7    Dr. Hilepo, yes.

8        Q      Do you still see Dr. Hilepo?

9        A      Yes.

10       Q      When did this happen when you

11   slipped on the stairs in 2018?

12       A      What do you mean when, what time?

13       Q      What month?

14       A      I don't remember what I ate

15   yesterday, I remember two years ago?

16       Q      Do you recall ever falling after

17   that time when you slipped down the steps to

18   your basement?

19       A      Where did I fall down, where, in my

20   house?

21       Q      I am just asking if you did fall

22   down any other time after that happened.

23       A      I don't remember.

24       Q      Do you have any pain or recurring

25   problems as a result of what you claim the

Page 188

C. Kosmidis

1

2     police officers did back on September 15,

3     2017?

4     ███  ████  ██████████

█     ████

█     ████████████

7         A     I don't know what's caused by all

8     the beating that I got from the police

9     officers, and I cannot say because I am not a

10    specialist.

11        Q     As you sit here today, do you have

12    any pain as a result of what happened back on

13    September 15, 2017?

14    ██████████  ████████████

█     ████

█     ████████████

17        A     Yes.  I don't know where they are

18    from.  I have pain in my body.  I have pain in

19    my back.  I am still getting -- I'm getting

20    dizzy.  I don't know where they're coming

21    from, I am 74 years old.

22        Q     Did you ever have pain in your back

23    prior to September 15, 2017?

24        A     No.  I told you I went for three

25    months to Greece, and I had an amazing and a

Constantino Kosmidis
May 10, 2019                                          189

Page 189

1                          C. Kosmidis

2        terrible and a bad time and I didn't have any

3        pain.  I went to Greece and I walked, I swam,

4        I played ball.  I did everything.  I didn't

5        have any pains.

6             Q      When was the last time that you saw

7        Dr. Blanck?

8             A      Blanck?

9             Q      B-L-A-N-C-K.

10            A      Which kind doctor do you mean?

11            Q      The neurologist.

12            A      The neurologist I saw two or three

13       times, and then he said, you don't have to

14       come back, so I stopped going.

15            Q      So the doctors you see today on a

16       regular basis are Dr. Hilepo, correct?

17            A      Dr. Hilepo, the cardiologist, my

18       urologist.  All of them I see every -- now

19       they said twice a year, but before I would see

20       them more often.

21            Q      Are you experiencing any urological

22       problems as a result of the incident on

23       September 15, 2017?

24       ███ ██████ █████████

25       █████████



Page 190

1                    C. Kosmidis

2    ████████████     ████████████

3    ████  ███████   ████████████

4    █████  ████████████████████████  █████

5    ██████████████████████████████████

6         A     Nothing, but he's watching my

7    prostate, and I don't know what else.  He

8    wants to see me every four months.

9         Q     Are you claiming to be disabled in

10   any way as a result of the incident on

11   September 15, 2017?

12   ████  ███████  ████████████

██   █████

██              ███████████████████████████

██   ████████

16        A     I don't know what may happen to me

17   tomorrow.

18        Q     Did you feel that you had any

19   disabilities on September 15, 2017?

20   ████  ███████  ████████████

21   █████

22             █████████████████████████████

23   █████████

24        A     Disability from where?

25        Q     Did you feel that you had any

Constantino Kosmidis
May 10, 2019                                                191



Page 191

1          C. Kosmidis

2  disabilities on your person --

3  ████  ██████  ████████████

4  ████

5     Q    -- on the date of the incident?

6  ████  ██████  ████████████

7  ████

8         ████████████████████████

9  ██████

10    A    My body is.  I don't know where

11 these pains are coming from, and everybody is

12 telling me that it's going to go away.  But

13 I'm afraid, I'm afraid I'll become disabled.

14    Q    But my question to you is, before

15 the police officers ever touched you on

16 September 15, 2017, were you claiming that you

17 had any type of limitations or you were

18 suffering from any disabilities at that time?

19 ████  ██████  ████████████

20 ████

21    ████████  ██████████████

22 ██████  ████████████

23 ████████████████  ██████████

24 ████████████████████████

25 ██████████████

Constantino Kosmidis
May 10, 2019

C. Kosmidis





Page 193

C. Kosmidis

A      What do you mean disability, that I

was blind or limping or?

Q      Did you feel that you had any

limitations that you were suffering from

anything before the police officers ever

touched you?

Constantino Kosmidis
May 10, 2019                                    194

Page 194

1                    C. Kosmidis

2       ████████

3       A       Well, tell the lady that when I

4  find out if something from these things that

5  happened to me makes me go blind or leaves me

6  paralyzed, I will then be able to answer.  At

7  this point in time I don't know.

8              ██   ████      █████████

█       ██████

10      Q       My question was, before anyone ever

11 touched you, did you feel that you had any

12 problems with your body or that you were

13 suffering from any type of disability or

14 limitation?

15              ████████   ██████████

16      ████   ██████████████

17      ████████████████████████

18      ████████████████

19      ████████████████████

20      ████████

21              INTERPRETER:  He is answering in

22 that he is having a problem of what's

23 happening now and I had to clarify that

24 you are talking about what happened right

25 before.

Constantino Kosmidis
May 10, 2019

195

Page 195

1           C. Kosmidis

2      MS. ALTERMAN:  Yes.

3    A     I was feeling like a young man.

4    Q     Is your hearing today worse than it

5  was back in September of 2015 -- 2017?

6    A     Sometimes it's the same or worse.

7  But I use to be able when I was one-on-one

8  with a person I use to be able to hear them.

9  And now this slowly goes away.

10   Q     Did the doctor who prescribed the

11 hearing aids that you are wearing today tell

12 you that it will take a while for you to

13 adjust to them?

14 ████  ████   ████████████

15   ████  █ ████████████████

16 ████████████████████████████

17 ██████████████  ████████████████

18 ██████████████

19   A     No doctor gave them to me.  The

20 doctor said that you have problem with your

21 hearing because of driving all these years and

22 because of your age, and from this side is a

23 lot and from the other side is less.

24   Q     Which doctor told you that?

25   A     I don't have the money to pay three

Constantino Kosmidis
May 10, 2019

196

C. Kosmidis

Page 196

1

2  to four thousand dollars to a doctor to give

3  me hearing aid; I don't have the money.

4      Q      Which doctor told you that you are

5  probably having these problems in your ears

6  from driving and from the age you are?

7      A      Dr. Hilepo sent me to a doctor; he

8  sent me to go to the doctor in Great Neck.

9      Q      Do you know the name of the doctor?

10     A      I don't remember.  I went once and

11 I knew I wasn't going to go back.

12     Q      How did you get the hearing aids

13 that you're wearing today?

14     A      I got them both for $699.

15             INTERPRETER:  He misunderstood the

16     question.

17     A      And I saw that it's the same -- the

18 only thing in the market that's FDA approved,

19 and I believe it's better when it's from the

20 government.

21     Q      Did any doctor prescribe them, or

22 were you able to just buy them on your own?

23     A      So, no, I didn't get this from the

24 doctor because the hearing aids that the

25 doctors prescribe cost three to four thousand

Constantino Kosmidis
May 10, 2019                                          197



Page 197

1                    C. Kosmidis

2    dollars, and I don't have the money for that.

3    So in the end I'll just stop hearing, that's

4    all.

21         Q      Do you regularly see an audiologist

22   for your hearing?

23         A      A special doctor to see -- he knows

24   what's wrong with me, what is he going to do

25   for me?



C. Kosmidis

Page 198

Page 199

1              C. Kosmidis

2        ████████  ██████████████████

3     ████████████████

4        ██████████   ███████████████

5        Q      When was the last time that you saw

6   an audiologist for your hearing?

7        ████  ███████  ████████  ███  ████

8   ████

9        ██████████████

10       A      Many years ago when I was in the

11  Union.

12       Q      Did you see an audiologist before

13  you went to get these hearing aids that you're

14  wearing today?

15       A      Didn't I tell you that Hilepo sent

16  me to the ear, nose, and throat doctor to

17  examine me.

18       Q      That was the doctor in Great Neck?

19       A      I only went to one ear doctor that

20  Hilepo sent me to.  I don't remember his name.

21       ████  ███████  ██████████  ████████

22   ████  ███████████████████████

23   ████████████████████████████████

24       ███████████   █████████   ████████

25   ████  ████████████

good evening -

we are not in

agreement at

this time,

PENGAD-Bayonne, N. J.

EXHIBIT

10

May 8, 2023

Dear Judge Rochon,

The jury has reached a decision.

Sincerely
The jury

PENGAD-Bayonne, N. J.

EXHIBIT
11
5/9/2003



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATHINA KOSMIDIS as executrix of the estate
of CONSTANTINO KOSMIDIS,

                              Plaintiff,

            -against-                                    Case No. 18-cv-08413 (JLR)

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,

                              Defendants.

JENNIFER L. ROCHON, United States District Judge:


## VERDICT FORM

**Court Exhibit 7**

**Question 1**:
**False Arrest:** Has plaintiff proved, by a preponderance of the evidence, that Mr. Kosmidis was subject to a false arrest under Section 1983/New York state law on September 15, 2017, keeping in mind that the defendants have the burden to prove probable cause, by:

a.   Sergeant Bernard Buckner:           Yes _____           No _____✓_____

b.   Police Officer Steven O'Shea:        Yes _____           No _____✓_____

c.   Police Officer Alexander Velez, Jr.:  Yes _____           No _____✓_____

d.   Police Officer Joseph Riccardi, Jr.:   Yes _____           No _____✓_____

*If you answered YES to either Question 1a, 1b, 1c, or 1d, proceed to Questions 2 and 3.*
*If you answered NO to all parts of Question 1, proceed to Question 4.*

**Question 2:**
(a)      Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's false arrest claim?

           Yes _____          No_____

(b)      If you answered YES to Question 2a, what amount of money should plaintiff be awarded in compensatory damages that would fairly and adequately compensate plaintiff for any injuries proximately caused by plaintiff's false arrest?

           $_____

(c)      If you answered YES to any part of Question 1, but you did not award any compensatory damages to plaintiff on plaintiff's false arrest claim, please enter a nominal damages award of $1.

           $_____

**Question 3:**
Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's false arrest claim by:

a.   Sergeant Bernard Buckner:           Yes _____          No _____

           If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

b.   Police Officer Steven O'Shea:        Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.   Police Officer Alexander Velez, Jr.:   Yes _____         No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.   Police Officer Joseph Riccardi, Jr.:   Yes _____         No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to Question 4)*

2

**Question 4:**

**Excessive Force**: Has plaintiff proved, by a preponderance of the evidence, that Mr. Kosmidis was subjected to excessive force under Section 1983 on September 15, 2017, by:

a.   Sergeant Bernard Buckner:          Yes _____          No ____✓_____

b.   Police Officer Steven O'Shea:      Yes _____          No ____✓_____

c.   Police Officer Alexander Velez, Jr.:   Yes _____          No ____✓_____

d.   Police Officer Joseph Riccardi, Jr.:   Yes _____          No ____✓_____

*If you answered YES to either Question 4a, 4b, 4c, or 4d, proceed to Questions 5 and 6.*
*If you answered NO to all parts of Question 4, proceed to Question 7.*

**Question 5:**

(a)      Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's excessive force claim?

            Yes _____          No _____

(b)      If you answered YES to Question 5a, please write the amount of compensatory damages on the line below that plaintiff has proven would fairly and adequately compensate plaintiff for any injuries proximately caused by defendant(s)' excessive force that Mr. Kosmidis suffered over and above what you have already compensated plaintiff for by your award, if any, on the previously considered claim for false arrest.

            $_____

(c)      If you answered YES to any part of Question 4, but you did not award any compensatory damages to plaintiff on plaintiff's excessive force claim, please enter a nominal damages award of $1.

            $_____

**Question 6:**

Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's excessive force claim by:

a.   Sergeant Bernard Buckner:          Yes _____          No _____

            If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

b.   Police Officer Steven O'Shea:      Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to Question 7)*

4

**Question 7:**
**First Amendment Retaliation**: Has plaintiff established by a preponderance of the evidence that Mr. Kosmidis was subjected to retaliation for exercising his First Amendment right to free speech on September 15, 2017, by:

a.  Sergeant Bernard Buckner:          Yes _____          No _____✓_____

b.  Police Officer Steven O'Shea:       Yes _____          No ____✓_____

c.  Police Officer Alexander Velez, Jr.:  Yes _____          No ___✓_____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____          No __✓_____

*If you answered YES to either Question 7a, 7b, 7c, or 7d, proceed to Question 8.*
*If you answered NO to all parts of Question 7, proceed to Question 10.*

**Question 8:**
(a)      Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's First Amendment retaliation claim?

Yes _____          No _____

(b)      If you answered YES to Question 8a, what amount of money should plaintiff be awarded in compensatory damages that would fairly and adequately compensate plaintiff for any injuries proximately caused by defendant(s)' first amendment retaliation that Mr. Kosmidis suffered over and above what you have already compensated plaintiff for by your award, if any, on the previously considered claims for excessive force and false arrest?

$_____

(c)      If you answered YES to any part of Question 7, but did not award any compensatory damages to plaintiff on plaintiff's retaliation claim, please enter a nominal damages award of $1.

$_____

**Question 9:**
Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's First Amendment retaliation claim by:

a.  Sergeant Bernard Buckner:          Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

5

b.  Police Officer Steven O'Shea:          Yes _____          No _____

      If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____          No _____

      If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.  Police Officer Joseph Riccardi, Jr.:   Yes _____          No _____

      If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to Question 10)*

**Question 10**:
**Failure to Intervene**: Has plaintiff proved, by a preponderance of the evidence, that a defendant listed below failed to intervene to prevent excessive force, false arrest, or retaliation by at least one of the <u>other</u> defendants on September 15, 2017?  If you answered YES as to a particular defendant for Question 1, 4, or 7, you may <u>not</u> also answer YES for that defendant for this Question.

    a.  Sergeant Bernard Buckner:        Yes _____        No ___✓_____

    b.  Police Officer Steven O'Shea:      Yes _____        No ___✓_____

    c.  Police Officer Alexander Velez, Jr.: Yes _____        No ___✓_____

    d.  Police Officer Joseph Riccardi, Jr.: Yes _____        No ___✓_____

*If you answered YES to either Question 10a, 10b, 10c, or 10d, proceed to Question 11.*
*If you answered NO to all parts of Question 10, **you have finished and please proceed to the last page of the verdict sheet and sign the verdict sheet.***

**Question 11:**
(a)    Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to compensatory damages for plaintiff's failure to intervene claim?

        Yes _____        No_____

(b)    If you answered YES to Question 11a, what amount of money should plaintiff be awarded in compensatory damages that would fairly and adequately compensate plaintiff for any injuries proximately caused by defendant(s)' failure to intervene that Mr. Kosmidis suffered over and above what you have already compensated plaintiff for by your award, if any, on the previously considered claims for excessive force, false arrest, and retaliation?

        $_____

(c)    If you answered YES to any part of Question 10, but did not award any compensatory damages to plaintiff on plaintiff's failure to intervene claim, please enter a nominal damages award of $1.

        $_____

**Question 12:**
Has plaintiff proved, by a preponderance of the evidence, that plaintiff is entitled to punitive damages for plaintiff's failure to intervene claim by:

    a.  Sergeant Bernard Buckner:        Yes _____        No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

b.  Police Officer Steven O'Shea:          Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

c.  Police Officer Alexander Velez, Jr.:  Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

d.  Police Officer Joseph Riccardi, Jr.:  Yes _____          No _____

If you answered YES regarding this defendant, state the amount of punitive damages that you award plaintiff against this defendant: _____

*(Please proceed to the last page)*

**You have completed all questions.  Please proceed to the signature line below.**

**SIGNATURE LINE**

Foreperson and other jurors, please sign and date the verdict sheet.  Then, without disclosing your verdict, advise the Marshal, that you have reached a verdict and are ready to return to the courtroom for the announcement of your verdict.



Foreperson

Dated:   05/09/2023